72,380

STATE OF KANSAS, *Appellee,* v. ROY MCCLANAHAN, *Appellant.*
(910 P.2d 193)

Opinion filed January 26, 1996. 

*Steven R. Zinn*, deputy appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*Timothy J. Chambers*, county attorney, argued the cause, and *Carla J. Stovall*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Defendant appeals his second conviction for first-degree murder and claims that the trial court abused its discretion in denying a motion for a mistrial following the State's improper cross-examination.

Roy C. McClanahan was convicted by jury in 1992 of premeditated first-degree murder in the shooting death of Michael Martin. In *State v. McClanahan*, 254 Kan. 104, 865 P.2d 1021 (1993), this court reversed McClanahan's conviction, holding that the trial court erred in failing to instruct the jury on the lesser included offense of second-degree murder, and we remanded the action for a new trial. We also held that evidence of McClanahan's prior abuse of his wife, who was not the victim of the crime, was improperly admitted. We addressed the prior abuse issue, despite McClanahan's failure to object to the evidence at trial, to insure that the evidence was not presented when the action was retried. McClanahan was retried and again convicted. The evidence at the second trial was essentially the same as at the first except for evidence of McClanahan's prior abuse of his wife.

Roy McClanahan and his wife Josephine separated in May 1991, and she then became involved with Michael Martin. Martin stayed overnight with Josephine on May 25-26, 1991. Shortly after 5 a.m., Josephine heard glass breaking and left the bedroom to investigate. She observed McClanahan with a shotgun. McClanahan entered Josephine's bedroom. Josephine heard a gunshot a couple of minutes later. As McClanahan departed the residence, he hit Josephine in the face with a shotgun. Michael Martin, who was in the bedroom, died of a single gunshot wound to the chest. The shotgun blast penetrated Martin's arm, which appeared to have

been raised in a defensive position, before striking his chest. Roy McClanahan turned himself in to the police after the shooting.

McClanahan testified at trial that he went to the house where Josephine was staying in the early morning hours to find out what was going on between Josephine and Martin. McClanahan insisted he did not intend to shoot anyone. He took a shotgun for protection because two people had warned him to leave Josephine and Martin alone. Upon arriving at the house he broke a window, reached in, and unlocked the back door. After entering the house, he saw Josephine coming out of a second floor room and putting on a housecoat over her naked body. McClanahan stated that he "flipped" and went into a "jealous rage." Pushing Josephine out of the way, he entered the dark bedroom. McClanahan released the safety on the shotgun and said, "Who's in here? Do to me what you just done to my wife." McClanahan stated that there was no reply but a few seconds later somebody pulled on the shotgun. According to McClanahan, as he pulled back, the shotgun went off. McClanahan insisted that the shooting was unintentional.

The one difference in the evidence at the two trials concerned testimony that before they separated, McClanahan had beaten Josephine. In the earlier trial, testimony revealed that Josephine had separated from McClanahan because he abused her. In McClanahan's first appeal, this court found that evidence of prior abuse was not relevant and was inadmissible because Josephine was not the person McClanahan had shot and killed.

At the second trial, Josephine testified that there was a reason she separated from McClanahan but, at the direction of the prosecutor, she did not specify that reason. McClanahan's daughter-in-law also testified that Josephine left McClanahan for an unspecified reason. During direct examination by his defense counsel, McClanahan testified that he was separated from Josephine, but he did not state the reason for their separation. He testified that he believed Josephine was with Martin at the time he went to the house where Josephine was staying. McClanahan also denied that he struck Josephine in the face with the shotgun.

During the State's cross-examination of McClanahan, the following occurred:

"Q. [By Mr. Fletcher, assistant county attorney] Isn't it true, Mr. McClanahan, that the reason Josephine left you is because you beat her?

"MR. MEISHEHEIMER [counsel for the defendant]: Your Honor, I object to that question. It is entirely inappropriate.

"THE COURT: Sustained.

"Q. (By Mr. Fletcher) Well, Mr. McClanahan, is it your testimony that you thought Josephine McClanahan was seeing Michael Martin?

"A. Yes, I thought she was.

"Q. And is it your testimony—it was your opinion that that's why she left you because—

"MR. MEISENHEIMER: He has not testified to that, Your Honor. That assumes a fact not in evidence.

"MR. FLETCHER: I can ask the question.

"MR. MEISENHEIMER: If he asks the question, is that what you think, then that's fine.

"THE COURT: I'm going to sustain the objection to the form of the question.

"Q. (By Mr. Fletcher) Mr. McClanahan, aren't you attempting to insinuate to the jury that the reason Josephine McClanahan left you is because she was seeing Michael Martin?

"A. Yes.

"Q. Isn't it true that the reason she left you was not because she was seeing Michael Martin?

"A. Yes.

"Q. And didn't you testify at a previous hearing the reason why she left you—

"MR. MEISENHEIMER: Your Honor, I object to this line of questioning. It is entirely inappropriate."

The jury was excused and the following proceedings were had in their absence, defendant being present:

"THE COURT: . . . What I was indicating to you when I called you up to the bench is that, as you know, the recent Supreme Court ruling in this case came down and indicated per the Supreme Court ruling that we cannot—that it is error to introduce any evidence of any prior abuse of Josephine McClanahan prior to her leaving Roy McClanahan. . . . I understand, Mr. Fletcher, that you're indicating that you're trying to contradict the impression that may have been given. You're indicating and your position is, if I'm understanding correctly, that there may have been an occasion at least in testimony of a prior hearing in this case, that Mr. McClanahan indicated that he knew that Josephine had left him because he'd beaten her and that's my understanding. You're saying he testified that way.

"MR. FLETCHER: Yes, Your Honor, Volume 2 of the transcript, Page 563, Line 6 through 8: 'Question: Isn't it true that the reason Josephine left you was because you beat her? Answer: Yeah, yes.'

"THE COURT: Okay. Now, is that the [first] trial transcript?

"MR. FLETCHER: Yes, Your Honor, cross examination.

"THE COURT: Okay. I understand that and the problem that we have in this case in light of the Supreme Court ruling which, as you know, was emphatic in the Supreme Court opinion when it came down on that is that at this point in time, in this particular trial, Mr. McClanahan has not testified in that regard yet so he has not yet, as you know, said something that would open—in other words, he has not said that in this particular hearing yet and that is the reason why it's not yet rebuttal evidence in this hearing. At least to my knowledge, I have not heard him testify that way in this particular hearing so there is no prior inconsistent statement to come in yet because there's been no statement yet in this particular hearing. Do you understand why I'm having to rule the way I am legally?

"MR. FLETCHER: You can rule the way you want, but I'm going to make a record on why I think you're wrong.

"THE COURT: I wanted you to understand.

"MR. FLETCHER: You make your ruling, Judge. I don't need to understand.

"THE COURT: Everyone needs to understand and we are going to clarify it for the record because I did try to explain it to counsel at the bench and counsel would not let me finish my statements, so we are going to put this on the record and my ruling and the reasons for the ruling because we really need to explain everything on the record in this case and it needs to be adequately covered on the record. Having said that, I'll be very happy to let both counsel respond, but I wanted to make very clear why I'm having to rule the way I'm ruling. Now, Mr. Fletcher, if you'd like to respond first.

"MR. FLETCHER: Yes, Your Honor, the Supreme Court ruling, the way you're interpreting it is completely incorrect. They said the State cannot present that evidence in direct. I'm presenting it on the cross examination of Mr. McClanahan. He's inferring to the jury, and Mr. Meisenheimer's talked about it in cross examination of about all of the State's witnesses about Josephine seeing Michael Martin and fooling around on him and that's the reason why she left him is for another guy. I have the right to ask Mr. McClanahan of a prior statement under oath, isn't the reason really why she left you is because you beat her and if you're saying that I can't get into that, that's your ruling and it's wrong and I disagree. You're saying the defendant can get up there and say whatever he wants and I can refute it, but I can't bring it out. That's a direct statement from his prior testimony.

. . . .

"MR. MEISENHEIMER: Your Honor, the facts are and the issue in terms of seeing—was Josephine McClanahan seeing Michael Martin certainly was brought out by the State in their testimony of Detective Conlon regarding his interview of Jim Lowe [Josephine's brother] and Teresa Lowe, by Teresa Lowe and by Jim Lowe. That issue all became—came out in terms of his threats about seeing or about harming them. That's the State's position that that indicates premeditation. . . . I at no point asked any question that elicited testimony from any of the State's witnesses that stated that they were separated because of marital in-

fidelity. The fact that the State offered evidence in its case in chief last time that the Supreme Court found to be erroneous, that then the defendant then had to— was questioned about and based on the Court's rulings in the prior case, properly questioned about, doesn't all of a sudden automatically make it admissible for purposes also of this trial in terms of attacking his credibility. . . .

"MR. FLETCHER: Your Honor, I disagree with the facts on a couple of things. Number one, Mr. McClanahan said he thought that Michael Martin was seeing his wife. There's no time frame. The State's time frame is clear. Josephine testified she didn't begin seeing Michael Martin and dating him until after she left Mr. McClanahan. That's the State's evidence and the other thing is that if you're going to allow the defendant to get up there and to infer to the jury that fooling around and we can't present evidence of why he left her and why she was scared of him, because he beat her, and why she didn't want anyone to know where she lived and I got a prior testimony of his under oath where he said yeah, the reason she left me is because I beat her. You rule, that's fine.

"THE COURT: No, I want to clarify one thing for the record and I certainly have a right to do that. If you recall, the Supreme Court pinpointed out the difference in this case and in a case where the wife herself has been the victim of a homicide. In a case where the wife herself had been the victim of a homicide, evidence of an ongoing pattern of abuse would probably be relevant. In this case we do not have the wife as the actual victim of the homicide and that was the reason the Supreme Court came out and, if you remember, the Court, in its opinion, made that distinction indicating that whether or not Mr. McClanahan beat his wife at an earlier time would not be relevant in this particular case and that was the reason that the Supreme Court made its ruling and this court has to honor the rulings of the Supreme Court of Kansas and in addition to that, the Court also has to weigh the probative value and prejudicial effect. In this case whether or not Mr. McClanahan, at an earlier time, beat Mrs. McClanahan is not relevant in this case because she was not the actual victim and that was the basis of the Supreme Court ruling and that is why this Court has no choice but to rule that way in this case and I am going to follow the Supreme Court ruling.

"MR. FLETCHER: Let's move on, Your Honor.

"THE COURT: Anything else we need to take up prior to the jury coming in?

"MR. FLETCHER: Let's go.

"THE COURT: Okay."

Following McClanahan's testimony, the defense moved for a mistrial. Although the State asked for a cautionary instruction, McClanahan requested that no instruction be given because it would highlight the error. No cautionary instruction was given at that time. The court denied the motion for a mistrial.

In this appeal, the defendant claims that the trial court abused its discretion in denying his motion for a mistrial and failing to

order a new trial due to the prosecutor's flagrant disregard of this court's decision in the first appeal by attempting to cross-examine him concerning the prior abuse and seeking to introduce evidence this court found not to be relevant. K.S.A. 22-3423(1)(c) provides that the trial court may declare a mistrial at any time termination of a trial is necessary because prejudicial conduct inside or outside the courtroom makes it impossible to proceed with the trial without injustice to either the State or the defendant. The party seeking a mistrial has the burden of showing that the party has been substantially prejudiced by the error. The granting or denial of a motion for mistrial is a matter which lies within the sound discretion of the trial court, and a trial court's decision concerning a mistrial will not be reversed by an appellate court absent an abuse of that discretion. *State v. Massey*, 242 Kan. 252, Syl. ¶ 4, 747 P.2d 802 (1987).

In the defendant's first appeal, this court held that evidence of the prior abuse of a person who was not the homicide victim was improperly admitted. We noted that the trial court admitted this evidence (1) as part of the res gestae of the offense, (2) because the defendant's counsel raised the subject of Josephine's adultery during voir dire, and (3) as evidence of a discordant marital relationship. This court rejected each of these reasons. We concluded under the facts that the prior abuse of the defendant's wife was not part of the res gestae because it was not connected to the killing of Martin. Also, the prior abuse was not connected to Josephine's subsequent act of adultery. Finally, the prior abuse against Josephine was not marital discord evidence because the prior abuse of the wife was not relevant to the defendant's motive or intent in shooting Martin. *McClandhan*, 254 Kan. at 116-18.

During the second trial, the prosecutor omitted reference to the defendant's prior abuse of Josephine until his cross-examination of the defendant. Then, the prosecutor specifically and bluntly asked the defendant if it was true that Josephine left him because he was beating her. The trial court sustained the defendant's objection before the defendant answered the prosecutor's question. The prosecutor then proceeded to elicit from the defendant that he wanted the jury to believe Josephine left him because she was

seeing Martin. After the defendant acknowledged that Josephine did not leave him because she was seeing Martin, the prosecutor again attempted to elicit from the defendant the reason why Josephine left him. The trial court refused to permit this inquiry.

The prosecutor argued to the judge that this court's decision in the first appeal was only that the State could not present evidence of the prior abuse by direct testimony. The prosecutor explained to the judge that he was following this court's ruling by introducing the evidence on cross-examination rather than direct. The prosecutor also suggested that because the defendant had implied to the jury that Josephine left him to be with Martin, the prosecutor could question the defendant about his prior statement in the first trial in which the defendant admitted that Josephine left him because he was beating her. The trial court rejected each of these arguments and found that the defendant had not opened the door and that the evidence of prior abuse was not relevant as determined by the Kansas Supreme Court in the first appeal.

In this appeal, the State contends that the defendant had opened the door for the State to present testimony as to the reason Josephine had left him. As support for this claim, the State points to the testimony of various persons that Josephine was involved in a relationship with Martin. The State questions why the defendant could insinuate to the jury that his wife left him for another man when the truth is she left him because he had previously beaten her. The State also argues that this court's holding in the first appeal that the abuse of the wife was inadmissible was dicta.

Various persons did testify during the State's case in chief that Josephine was involved in a relationship with Martin. There was testimony presented by the prosecutor and clarified by the defense's cross-examination that Josephine's brother observed her with Martin at a time before Josephine and the defendant were separated. The defendant then elicited from Josephine's brother on cross-examination that seeing Josephine and Martin together raised some suspicions in his mind about what was going on between Josephine and Martin. There was also testimony introduced by the prosecutor that the defendant told Josephine's brother and his wife that he believed Josephine was "stepping out" on him and that he

would kill both Josephine and the person she was with. However, none of these witnesses testified or implied that the relationship with Martin was the reason Josephine left the defendant. Josephine testified that she became involved with Martin after she separated from the defendant.

We agree that a party can open the door for otherwise inadmissible evidence. See *State v. Johnson*, 258 Kan. 475, 481, 905 P.2d 94 (1995). However, the State's reasoning that the door had been opened and that it was permitted to refute the defendant's implication that Josephine left the defendant because she was seeing Martin is flawed. At the time the State asked the defendant if Josephine left him because he was beating her, there had been no testimony of what caused the separation or any indication that Josephine left him because she was seeing Martin. Therefore, no door had been opened by the defense for the prosecutor to introduce the inadmissible testimony at that point.

After the defendant's objection to the prosecutor's question whether Josephine left the defendant because he was beating her was sustained, in answer to the prosecutor's questions the defendant admitted that he wanted the jury to infer that Josephine left him because she was seeing Martin. This testimony, however, was elicited by the prosecutor during his cross-examination of the defendant. While a party can open the door to otherwise inadmissible evidence, that rule applies only when one party opens the door for another party to present such evidence. A party cannot open the door for itself to present the inadmissible evidence. If a door was opened here, it was opened by the prosecutor. The trial court properly sustained the defendant's objections to the prosecutor's questions concerning his prior physical abuse of Josephine. The evidence was inadmissible under the opened door theory.

In the defendant's first appeal, when determining that testimony of the defendant's prior abuse of Josephine was inadmissible, we made no distinction as to whether the evidence could be introduced by the State during direct or cross-examination. Although, as the State points out, this court actually reversed the defendant's conviction because of the trial court's failure to give an instruction on a lesser included offense, this court's statement in the first ap-

peal that the evidence of prior abuse was inadmissible was not dicta; it was to insure the same error would not be perpetuated in the second trial. Unless the evidence in the defendant's second trial was substantially different than that in the first trial, evidence of the defendant's prior abuse of Josephine was not relevant or admissible in the second trial. See *State v. Humphrey*, 258 Kan. 351, Syl. ¶ 4, 905 P.2d 664, *modified* 258 Kan. 372, 905 P.2d 664 (1995). Here, the record reveals that the evidence in the second trial was not substantially different than that in the first trial; therefore, the evidence was not relevant and was also inadmissible in the second trial.

The trial court found that the defendant had not been substantially prejudiced by the State's questioning; therefore, a mistrial was not warranted. The defendant argues on appeal that the prosecutor's flagrant disregard for this court's decision in his first appeal required a mistrial here. The defendant points out that the State attempted to lay a foundation to admit evidence of marital discord by asking leading questions about whether Josephine left the defendant because he had beaten her and whether the defendant had previously testified about the reason Josephine had left him. The defendant concludes that "[i]t is unrealistic to believe that the jury did not put two and two together and understand that Roy had admitted that he had beat Josephine." The defendant reasons that the State's improper questions caused the jury to believe that he had a violent disposition and was predisposed to premeditated murder. The defendant asserts that a cautionary instruction would have highlighted the inadmissible evidence of abuse and would have been disregarded by the jury. The defendant argues that the prosecutor intentionally prejudiced his right to a fair trial; therefore, the trial court abused its discretion in failing to declare a mistrial.

The defendant reasons the prosecutor's intentional violation of our order in the first appeal is analogous to a prosecutor's violation of a district court's order in limine. In *State v. Massey*, 242 Kan. at 265, this court recognized the reason for an order in limine is that evidence will be inadmissible at trial and the mere offer of or statements made during trial concerning the inadmissible evidence

will tend to prejudice the jury. In evaluating alleged violations of an order in limine, it must first be found that a violation occurred and then determined whether the facts elicited in violation of the order substantially prejudiced the defendant. *State v. Warden*, 257 Kan. 94, 125, 891 P.2d 1074 (1995); *State v. Bowen*, 254 Kan. 618, Syl. ¶ 2, 867 P.2d 1024 (1994).

In *Massey*, 242 Kan. 252, the defendant sought a mistrial after a State's witness violated an order in limine precluding testimony that a hole in the bedspread which covered the murder victim was caused by a bullet. The cause of the hole in the bedspread was significant because there were no powder burns surrounding the gunshot wound on the victim, which meant either that the gun was fired at least 2 feet away from the victim, consistent with Massey's testimony that the victim was accidentally shot when Massey experienced a seizure, or that a barrier was placed between the gun and the victim. No tests had been conducted to determine whether a bullet created the hole in the bedspread. The bedspread was admitted on the understanding that the jury would draw its own conclusions concerning the hole. The State had warned its witnesses not to give an opinion on what caused the hole. However, upon the State's questioning of a witness as to whether there were any markings on the bedspread and if it was torn or tattered, the witness testified that there "appeared to be a bullet hole through the bedspread." After Massey's objection, the State elicited from the witness that his testimony about the hole in the bedspread was based on the witness' speculation and that no tests had been conducted on the bedspread. 242 Kan. at 263.

The trial court denied Massey's motion for a mistrial because the State had been careful to point out to the jury that the witness was only stating an opinion. Then, in closing argument, the State argued to the jury that the lack of powder burns on the victim could have been caused by a barrier between her body and the gun and that " 'we can't prove what made that hole in the blanket, all we can do is look at the possibilities.' " 242 Kan. at 264. This court concluded that the violation of the order in limine prejudiced Massey. Because no reasonable person would agree with the trial court's decision that the facts elicited by the State after the violation

made it possible to proceed without substantial injustice to Massey, this court found that the trial court abused its discretion in failing to grant a mistrial. 242 Kan. at 265.

In *Bowen*, 254 Kan. 618, an order in limine precluded testimony about gang membership. The State elicited testimony from a law enforcement officer that he was assigned to a gang task force and to a unit that focused on drug and gang activity. The trial court denied Bowen's request to strike the testimony because to do so would have brought out the testimony even more. Bowen argued that he had been subject to substantial injustice because of the failure to strike the testimony. The trial court had found that there was no violation of the order in limine because the officer's testimony did not link Bowen to a gang. This court found that even if there had been violation of the order in limine, the defendant had not suffered substantial prejudice requiring a mistrial. 254 Kan. at 624.

In *Warden*, 257 Kan. 94, an order in limine precluded testimony about Warden's suicide attempt. However, a witness volunteered, in violation of the order, that Warden told her he tried to kill himself. Warden objected, but his motion for a mistrial was denied. The trial court determined that there was a violation of the order in limine but the violation was not intentional and the testimony was subject to more than one inference. The court instructed the jury to disregard the last several answers of the witness and found that Warden was not substantially prejudiced by the testimony. In affirming the trial court, this court distinguished *Massey* because the *Warden* jury was instructed to disregard the inadmissible statements of the witness in a way that did not highlight the inadmissible testimony and because there was no other reference during trial to Warden's suicide attempt. Moreover, the jury would not necessarily infer from the suicide attempt that Warden was guilty of the charges; the jury also could infer that Warden attempted suicide due to the mere fact of being charged with the offense. We concluded that the testimony in violation of the order in limine was not so prejudicial that no reasonable person would fail to grant a mistrial. 257 Kan. at 127.

Here, the testimony concerning the defendant's prior abuse of Josephine was inadmissible. However, the determination of whether the mere mention of the prior abuse by the prosecutor substantially prejudiced the defendant's right to a fair trial is a more difficult question. Because the defendant's conviction in the first trial was reversed for a different reason, this court's decision in the first appeal did not discuss prejudice resulting from admission of the evidence. In this appeal, we are required to determine if the defendant's right to a fair trial was substantially prejudiced by the State's questions to such an extent that the trial judge was required to grant a mistrial.

*Massey* is distinguishable because the court here sustained the defendant's objection before an answer to the question was given, and there was no other reference to the defendant abusing Josephine. No evidence of the defendant's abuse of Josephine or the fact that Josephine had left the defendant because he had beaten her was admitted. Although evidence of prior abuse was referred to by the prosecutor and the jury could have inferred from the State's questions that Josephine had left the defendant because he had abused her, the defendant has not shown that he was substantially prejudiced by the questions such that no reasonable person would agree with the trial court's determination that a mistrial was not warranted. The defendant had the opportunity for a cautionary instruction to be given to the jury, but he declined the instruction. The trial court did not abuse its discretion in denying the defendant's motion for a mistrial.

This determination does not, however, minimize the State's flagrant disregard of this court's decision in the defendant's first appeal. To show the prosecutor's persistent disregard for the trial judge's ruling, we have included a portion of the trial transcript.

"MR. MEISENHEIMER: Your Honor, based on the questions that were asked by the assistant county attorney in his cross examination of the defendant, I believe that it's necessary and appropriate at this point in time to ask for a mistrial. It's the defendant's position that those questions are in blatant violation of the Supreme Court decision that was entered in this case based on the first trial. Once those questions are asked, the answer becomes obvious and that was the—I don't know what the intent was, but that is the result and as a result, the defendant is

not able to get a fair trial and the Supreme Court was pretty clear that that wasn't evidence that should be considered and we would ask for a mistrial.

"THE COURT: Mr. Fletcher.

"MR. FLETCHER: Yes, Your Honor. Number one, we've stated all of the reasons why the question was appropriate. We disagree with your ruling that we couldn't get into it. Secondly, I disagree with how you interpret the Supreme Court decision, but you've already ruled and if you're going to grant a mistrial, it's totally discretionary with you. The question was objected to, you didn't allow an answer if I recall, but you'd have to check with the court reporter and, secondly, if you think that there might be some error, all you have to do is give them a cautionary instruction and that'll be enough. There's no reason for a mistrial and I still can't believe you ruled the way you did, but that's your ruling and we see no reason for a mistrial.

"THE COURT: Mr. Meisenheimer, would you like to respond? Mr. Fletcher, I will say one thing, and I'd like to say this on the record. You certainly have a right to disagree with this Court's ruling. In this particular case you're not only disagreeing with my ruling, but you're disagreeing with the Supreme Court's ruling which I am obligated to follow. I want to admonish you that you do not have the right to speak in derogatory terms about the court, and I'm not talking about me personally. I'm talking about the court in general. If you don't agree with the Court's ruling, that's fine. You certainly have a right to disagree and we'll note that for the record, but we are not going to get into an argument. There's going to be integrity and dignity in this courtroom by all participants and I have no objection to your disagreeing, but I do have disagreement with any derogatory remarks and they will not be tolerated by anyone in this courtroom and that's not for me personally. That's from the standpoint of the court itself. It's important that in any judicial proceeding we all maintain integrity and dignity and courtesy in this courtroom and as long as I'm on this bench, that's what's going to happen. Now, in this particular case, I—the question was objected to about the beating. I have explained my reasons. I don't feel I need to go into further explanation. I've told you what the Supreme Court said and why they said it and I am upholding the Supreme Court of the State of Kansas and I will continue to do so as long as I am a judge on this bench. At this point in time, I do not feel, though, that the remarks were prejudicial enough to justify the granting of a mistrial."

The defendant argues that the prosecutor's misconduct in bringing up the prior abuse was an intentional violation of our prior order and requires a new trial. As authority the defendant cites *State v. Lewis*, 238 Kan. 94, 98, 708 P.2d 196 (1985), where this court listed three factors which should be considered in determining whether there should be a new trial due to prosecutorial misconduct:

"First, is the misconduct so gross and flagrant as to deny the accused a fair trial (*i.e.*, are the objectionable statements likely to affect the jurors to the defendant's prejudice)? Second, do the remarks show ill will on the prosecutor's part? Third, is the evidence against the defendant of such a direct and overwhelming nature that it can be said that the prejudicial remarks of the prosecutor were likely to have little weight in the minds of the jurors?"

In *Lewis*, the prosecutor failed to inform the court and the defense that a report which would be entered into evidence had been corrected. The corrections to the report defeated the theory of defense presented in opening statements. This court held that neither an admonition nor instructions by the trial court could cure the resulting prejudice. 238 Kan. at 99.

Prosecutorial misconduct during closing argument has been considered by this court numerous times. In the recent case of *State v. Spresser*, 257 Kan. 664, 896 P.2d 1005 (1995), the prosecutor had mentioned the impact on other victims' lives if the defendant was released. The trial court sustained the defendant's objection and instructed the jury to disregard the prosecutor's comment. Although agreeing that the prosecutor's comment was improper, this court found that reversal was not required. We recognized that although some remarks may be so prejudicial as to be incurable, this court had never found a remark to be incurable where the jury was instructed to disregard the remark. We declined to declare the improper remark in *Spresser* to be the first incurable one. 257 Kan. at 672. Thus, we held that generally where an objection to an improper comment is sustained and the jury is instructed to disregard the comment, the comment is not incurable.

Here, unlike in *Spresser*, the jury was not instructed to disregard the State's question because the defense requested a cautionary instruction not be given so as not to highlight the improper question. However, the defendant's objection to the question was sustained before the defendant answered the question.

We note that the trial judge instructed the jury that it was to consider as evidence whatever is admitted in the trial as part of the record, whether it be the testimony of witnesses or an article or document marked as an exhibit or other matter admitted, such as an admission, agreement, or stipulation. The judge further in-

structed the jury that at times during the trial, the judge had determined objections to the admission of certain evidence; questions relating to the admissibility of evidence were questions of law for the court and the jury was not to concern itself with the reasons for the rulings. In considering the case, the jury was told not to draw inferences from the court's rulings and that it must consider only the evidence which was admitted. The judge also instructed that statements, arguments, and remarks of counsel were intended to help the jury in understanding the evidence and in applying the law, but they were not evidence. The jury was instructed to disregard any attorney's statement that had no basis in the evidence. The jury is presumed to have followed the court's instructions to decide the case on the evidence and not consider the comments of counsel. See *State v. Tyler*, 251 Kan. 616, Syl. ¶ 13, 840 P.2d 413 (1992).

This court explicitly stated in the first appeal that the evidence of abuse to someone other than the victim was inadmissible, yet the State attempted to present that evidence in the second trial without seeking a ruling from the trial court on its admissibility. Clearly, prosecutorial misconduct occurred here. Moreover, the State persisted in arguing to the trial judge that the evidence was admissible. This court does not condone such misconduct.

We note that if the prosecutor's misconduct was intentional and substantially prejudiced the defendant's right to a fair trial, double jeopardy would prohibit a new trial. The Double Jeopardy Clause of the United States Constitution protects against a second prosecution for the same offense after acquittal, a second prosecution for the same offense after conviction, and multiple punishments for the same offense. The underlying protection contained in the Double Jeopardy Clause of the United States Constitution is contained in § 10 of the Kansas Constitution Bill of Rights. *State v. Cady*, 254 Kan. 393, Syl. ¶¶ 1, 2, 867 P.2d 270 (1994). In order to implement and define the constitutional protection against double jeopardy, the Kansas Legislature enacted two statutes: (1) K.S.A. 21-3107, concerning multiple prosecutions for the same act, and (2) K.S.A. 21-3108, concerning the effect of former prosecution. K.S.A. 21-3107 defines the right of the prosecution to charge

more than one offense based on the same act and to convict of an included offense not specifically charged. It formulates the limitations upon unfair multiplicity of convictions and prosecutions. K.S.A. 21-3108 attempts to cover the complex problems of former jeopardy. *Cady*, 254 Kan. 393, Syl. ¶ 3. K.S.A. 21-3108(1)(c) prohibits retrial if the prior trial was terminated without the consent of the defendant, except in specific circumstances which do not exist here.

In *Cady*, 254 Kan. 393, Syl. ¶ 4, this court stated that the constitutional interest protected by *Oregon v. Kennedy*, 456 U.S. 667, 72 L. Ed. 2d 416, 102 S. Ct. 2083 (1982), is that a defendant should be allowed to freely choose whether to request a mistrial and forego the right to have the matter decided by the first trier of fact. Where the prosecutor seeks to force the defendant into a choice, the choice is not freely made and the prosecutor has subverted the defendant's rights protected by the Double Jeopardy Clause of the Constitution. Here, if the defendant was forced into requesting a mistrial by the prosecutor's intentional misconduct, retrial would be barred by K.S.A. 21-3108(1)(c) and by the Double Jeopardy Clauses of the Kansas and United States Constitutions.

In evaluating the misconduct that occurred here, the question remains whether the prosecutor's intentional attempt to introduce inadmissible evidence substantially prejudiced the defendant's right to a fair trial and required the defendant to ask for a mistrial. Because the right to a fair trial is at issue, we apply the federal constitutional error standard. An error of constitutional magnitude is serious and may not be held to be harmless unless the appellate court is willing to declare a belief that it was harmless beyond a reasonable doubt. Before we may declare the error harmless, we must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. *State v. Johnson-Howell*, 255 Kan. 928, 944-45, 881 P.2d 1288 (1994).

We now apply the three factors set out in *Lewis*, 238 Kan. at 98, and the constitutional harmless error standard to determine if the prosecutorial misconduct here was so gross and flagrant that it requires the granting of a new trial. The prosecutor's actions show

an ill will toward the defendant's right to a fair trial. The comments implying that the defendant was a violent person could have somewhat affected the jurors to the defendant's prejudice. However, after reviewing the evidence, we are able to conclude beyond a reasonable doubt that the evidence against defendant was of such a direct and overwhelming nature it can be said that the prejudice caused by the prosecutor was likely to have had little weight in the jurors' minds and did not change the result of the trial.

Affirmed.