No. 81,220

STATE OF KANSAS, *Appellee*, v. WILFORD MOLESTER GALLOWAY, *Appellant.*
(1 P.3d 844)

Opinion filed March 10, 2000.

*Douglas L. Adams, Jr.*, special appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*Angela M. Wilson,* assistant district attorney, argued the cause, and *Christine Kenney Tonkovich,* district attorney, and *Carla J. Stovall,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Defendant appeals his conviction of felony murder claiming (1) the trial court erred by admitting evidence of the character of the victim and (2) the trial court failed to grant a mistrial because a witness testified concerning a statement by the defendant which was previously ruled inadmissible by the court.

On the afternoon of May 31, 1997, deputies from the Douglas County Sheriff's Department discovered the body of Floyd White lying in a ditch just west of the city limits of Lawrence, Kansas. Two gunshots had penetrated White's head. The condition of the body and the presence of wet blood indicated that White had been dead for less than 2 hours. A Hardee's Restaurant sandwich wrapper was found in the proximity of White's body. On June 17, 1998, Wilford Galloway was charged with the crime of first-degree murder.

Prior to Galloway's trial, the State requested the district court to rule as to whether a statement unrelated to the murder made by Galloway to the police prior to Galloway's arrest was admissible. During a traffic stop which occurred shortly after White's death, Galloway stated to the police that he had just gotten out of prison after serving time for the crime of murder. The statement was a fabrication. The State asserted that Galloway's untruthful statement to the police was evidence that supported the testimony of a State's witness that the witness had reason to fear Galloway. The judge refused to rule on the admissibility of the statement until the circumstances of its admissibility became a question during the trial.

The trial commenced January 12, 1998. The State's primary witness was Richard Kahle. Kahle was with Galloway and White on the day of the homicide.

### Kahle's Testimony

Kahle drove White, Galloway, and another man, John Mumford, to Kansas City in Kahle's recreational vehicle (RV) early in the

morning on May 31, 1997. The men were drinking vodka and smoking cigars. In Kansas City, they stopped at a house. Galloway went in the house and returned with a handful of "white paper or something." Kahle drove towards Lawrence. Just outside Lawrence, the men decided to return to Kansas City. Galloway entered the house and again returned with "rock or something."

The men returned to Lawrence and let Mumford out at a local park. At the stop, Galloway saw that Kahle had a Derringer. Galloway asked to see the gun. Kahle gave the gun to Galloway.

After leaving Mumford at the park, the men drove to White's girlfriend's apartment. White went inside the apartment while Kahle and Galloway remained in the RV. When White returned, the men drove to Big Springs, Missouri, to look at a car that Kahle was selling. After seeing the car, White offered to buy Kahle and Galloway lunch. They stopped at a Hardee's Restaurant in Lawrence. White went inside to purchase sandwiches.

While White was inside Hardee's, Galloway asked Kahle about the money White was carrying. Kahle told Galloway that White had "five[s], tens, twenties, and . . . a bunch of change." When White returned to the RV with the food, the men returned to Big Springs so White could purchase Kahle's car. Along the way, White and Galloway argued as to which of them would purchase Kahle's car.

Kahle stopped the RV outside Lawrence so the men could relieve themselves along the side of the road. While they were outside the RV, the argument as to who would buy the car continued. There were two gunshots. Galloway returned to the RV, placed a black wallet, some papers, and money on the seat, and said, " 'Let's get the hell out of here.' "

Kahle drove Galloway toward Kansas City on the Kansas Turnpike. He observed Galloway put a wallet and papers into a Hardee's sack, roll down the window, and throw the sack toward the Kansas River. Kahle and Galloway did not discuss what had happened.

After Galloway and Kahle arrived in Kansas City, Kahle was stopped by the Kansas City police for a traffic violation. Kahle gave the officers permission to search the RV. During the search, Kahle was placed in the patrol car. After searching the RV, the police

questioned Kahle regarding the items found. Kahle did not mention his suspicions about White's demise to the officer. Kahle and Galloway were released. On the return trip to Lawrence, Galloway stated that if asked, Kahle was to say that they had been in Kansas City drinking and fishing. Kahle dropped off Galloway in Lawrence.

Later that day Kahle again met Galloway. Galloway asked if Kahle had been questioned by the police. Galloway told Kahle that if he was questioned, he should tell the police that they left White at Hardee's and had not seen him since. The next time Kahle met Galloway was in mid-June when sheriff's detectives requested that Kahle wear a wire and attempt to get Galloway to say something about the whereabouts of the gun he used to shoot White.

In the recorded conversation which resulted from Kahle wearing the police wire, Galloway instructed Kahle regarding ways to keep his story consistent with Galloway's story. On the tape, Galloway repeatedly reviewed the events surrounding White's death. Galloway warned, " 'If I go down, you go down. You go down, I go down. . . . I don't need no murder charge.' " Kahle did not protest Galloway's implication that Kahle was involved in the murder. The version of events Galloway reviewed with Kahle is consistent with Galloway's trial testimony. Galloway also encouraged Kahle on the tape to remove any hamburger trash from the RV because the hamburger could tie them to White's murder. The tape-recording was played for the jury. The jury was also given a transcript of the conversation.

### Galloway's Testimony

The trips made in the RV to Kansas City were to buy crack cocaine. It was Kahle who entered the house and purchased drugs. As the men drove toward Lawrence, smoking cocaine, Mumford became paranoid, claiming to see someone outside the RV. To reassure Mumford that there was no one outside the RV, Galloway asked Kahle to stop. Galloway testified that Kahle handed him a gun and said to "shoot him" or, perhaps, "tell [Mumford] to shoot him." Galloway was stunned at the suggestion, showed the gun to Mumford, and returned it to Kahle.

Galloway had no intention of buying Kahle's car. Kahle pressured White to buy the car because Kahle needed money. Galloway stated that he tried to dissuade White from buying Kahle's car because White did not have a driver's license.

Galloway denied seeing Kahle's gun or asking Kahle about his gun when Mumford left the RV. When the men stopped at Hardee's on the turnpike outside Lawrence, White went into the restaurant and Galloway went to sleep in the back of the RV. Galloway did not wake until they were in Kansas City. Galloway noted the absence of White. Kahle told Galloway that White had stayed at Hardee's. Galloway had no reason to doubt Kahle because he knew White had relatives who worked at the restaurant.

Kahle again purchased cocaine at the house in Kansas City. Kahle was stopped by the police for a traffic violation approximately four blocks from the house. The next morning Galloway learned that White had been killed.

## TRIAL ISSUES

Galloway was convicted of felony murder and sentenced to life in prison. He appeals, raising several issues. Galloway contends that the court abused its discretion in allowing White's sister to testify regarding the good character of her brother. He argues that the testimony was not relevant and was designed to inflame the jury against Galloway.

### Victim's Character

Galloway argues that admission of testimony regarding the victim's good character was prejudicial and reversible error. Except as otherwise provided by statute, constitutional prohibition, or court decision, all relevant evidence is admissible. K.S.A. 60-407(f); *State v. Smallwood*, 264 Kan. 69, 84, 955 P.2d 1209 (1998). Relevant evidence is evidence having any tendency in reason to prove any material fact and the determination of relevancy is a matter of logic and experience, not a matter of law. K.S.A. 60-401(b); *Simon v. Simon*, 260 Kan. 731, 741, 924 P.2d 1255 (1996).

Evidence that a person committed a crime or civil wrong on a specified occasion is inadmissible to prove his or her disposition to

commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448, such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. K.S.A. 60-455.

Except as otherwise provided under the rules of evidence, the trial judge may in his or her discretion exclude evidence if he or she finds that its probative value is substantially outweighed by the risk that its admission will unfairly and harmfully surprise a party who has not had reasonable opportunity to anticipate that such evidence would be offered. K.S.A. 60-445.

Dolly White, the victim's sister, a State's witness, testified:

"Q: [Prosecutor] And can you tell us a little bit about Floyd White?

"A: He was a veteran. He served in the Air Force and the Army. He was a pretty good guy. He was real intelligent and really generous, fun loving guy.

"Q: How long was he in the military?

"A: I think between the two branches, about eighteen years.

"Q: And you said Floyd was a generous person. Can you tell us or give us an example?

"A: He'd give you the shirt off his back, give you anything. If you needed something, just ask him for it. He'd give it to you.

"Q: Was Floyd a violent or aggressive person?

"A: No, he wasn't a violent person at all.

"Q: Did Floyd—did Floyd carry money?

"A: Yes.

"Q: Can you describe how he carried his money?

"A: Well, he would carry his money—he had a wallet in his billfold in which he carried all of his important affairs so he probably had a billfold that looked real thick.

"Q: Did he ever show his roll of money?

"A: Oh, yeah, sometimes he would show his roll.

"Q: Liked to show his money to people?

"A: Yeah.

"Q: Did Floyd fish?

"A: Oh, yes.

"Q: He liked to fish?

"A: Yeah, he loved it.

"MS. MADER [Defense counsel]: Objection as to the relevancy of this line of questioning.

"THE COURT: Mr. Trapp [prosecutor]?

"MR. TRAPP: It's orientation. Mr. White can't be here to give a little example of the kind of person he was and the questions will be brief.

THE COURT: I'll allow a little bit more. Go ahead."

The prosecutor asked no more questions regarding the victim's character.

On appeal, the State abandons the argument made to the trial judge that the testimony was relevant for "orientation" purposes. The State argues on appeal that although the trial court erroneously based its decision to allow the testimony on the prosecutor's claim that the testimony provided "orientation," the decision to allow the testimony should be upheld if the testimony was admissible on other grounds. The State argues that White's testimony was admissible to corroborate the testimony of Kahle that White liked to show off his roll of cash, that White enjoyed fishing, and that White would give people money or other items when asked. The State further asserts that even if the testimony was erroneously admitted, its admission was harmless. To counter the State's argument, Galloway cites *State v. Donesay*, 265 Kan. 60, 959 P.2d 862 (1998).

In *Donesay*, the trial court allowed the deceased police officer's widow to testify at length regarding her relationship with the victim, other family members, and friends. The testimony consumed 28 pages of the trial transcript and included information regarding the victim's pleasant disposition, career goals, and the last kiss the deceased police officer gave the widow as he left for work on the day of his death. In addition to eliciting character evidence from the victim's wife over defense objections, the prosecutor told the jury in opening statements the details of what the victim's wife would testify to.

Unlike the circumstances in this case, the defendant in *Donesay* did not deny that he shot the victim. The primary issue in *Donesay* was whether the defendant killed the victim with premeditation. There was no evidence in the case of the defendant's premeditated intent to kill the victim.

The *Donesay* court found that the widow's testimony was not relevant to any material fact of the crimes charged but was intended to influence the jury and prejudice the defendant's right to

a fair trial. 265 Kan. at 85. The error was compounded in opening and closing statements when the prosecutor referred to the testimony at length. Under these circumstances, the *Donesay* court could not conclude beyond a reasonable doubt that the admission of the testimony of the victim's widow was harmless. 265 Kan. at 89.

We note that while Dolly White's characterization of her brother was consistent with Kahle's description of White's actions on the day of the shooting, it was not inconsistent with Galloway's testimony. The sister's testimony did not prove a relevant fact and was erroneously admitted into evidence. Was the admission of this evidence harmless?

To determine whether the admission of irrelevant testimony regarding the good character of the victim was harmless, the *Donesay* court set out the dual analysis an appellate court must apply. First, an appellate court must determine if the admission of the evidence was inconsistent with substantial justice, *i.e.*, whether substantial rights of the defendant were affected by the admission of the testimony. Second, if the admission of the evidence was inconsistent with substantial justice, can the appellate court declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial? 265 Kan. at 88.

The primary issue at Galloway's trial was whether the jury believed Kahle's version of the events that Galloway had killed White or Galloway's version that he last saw White at a Hardee's Restaurant. However, there was evidence other than Kahle's testimony to support the State's case against Galloway. The other evidence included the recorded conversation of Kahle and Galloway. During the recorded conversation which occurred several days after the killing, Galloway made no explicit admissions but he adamantly encouraged Kahle to support his version of the events and repeatedly reviewed his version of the events with Kahle. He cautioned Kahle to tell the police he did not know how White was killed. Galloway threatened that if Kahle implicated him in the murder, he would, in turn, implicate Kahle. Furthermore, Galloway assured Kahle that the police would not find a weapon and told Kahle to destroy evidence that could tie them to the murder. Based on the

recorded conversation, a jury could reasonably find that Galloway murdered Floyd White.

This case is distinguishable from *Donesay*. Here, the erroneous character evidence was not reinforced further by the prosecutor's opening statement or closing argument. In addition, the taperecording provides substantial independent evidence from which a jury could find Galloway was guilty of the murder. After reviewing the evidence, we can declare beyond a reasonable doubt that the testimony of White's sister regarding White's good character, although erroneously admitted, had little, if any likelihood of having changed the result of the trial.

## Motion for Mistrial

When stopped by the police for a traffic violation on the day of the murder, Galloway told the police that he had just gotten out of prison for murder. It is not known why Galloway made the statement to the police, but it is clear that the statement was not true.

Prior to trial, the prosecutor requested the district court to rule as to the admissibility of the statement. At the hearing, the prosecutor argued that Galloway's false statement was evidence which called into question Galloway's credibility and would explain to the jury why Kahle was too afraid of Galloway to report Galloway's killing of White to the police during the traffic stop.

The purpose for an order in limine is to exclude inadmissible evidence from trial, recognizing that the mere offer of inadmissible evidence at trial can prejudice the jury. *State v. Massey*, 242 Kan. 252, 265, 747 P.2d 802 (1987). A motion in limine should be granted if the trial court finds two factors are present: (1) The material or evidence in question will be inadmissible at a trial under the rules of evidence; and (2) the mere offer of evidence or statements made during trial concerning the material will tend to prejudice the jury. *State v. Copridge*, 260 Kan. 19, 27-28, 918 P.2d 1247 (1996).

At trial, Galloway called Officer Kelly Herron to testify regarding the traffic stop in Kansas City. During the cross-examination of Herron, the prosecutor approached the bench and proffered that

if he asked the witness questions regarding statements made by Galloway during the traffic stop, the officer would testify that Galloway had stated, "I have been in prison before for murder." The prosecutor argued to the court that the statement was relevant as it would inform the jury why Kahle felt so threatened by Galloway that he did not report the killing of White to the police. The court found neither Kahle's testimony nor other evidence indicated that Kahle had been aware of Galloway's statement and denied the prosecutor's request to admit the statement into evidence.

The next witness called was Officer John Hudson, the other officer who made the traffic stop in Kansas City. On cross-examination, the prosecutor asked Hudson if Galloway had told him how he came into contact with Kahle. Hudson responded:

"I believe he stated that he had run into [Kahle] in Lawrence and they were going to drive down to Kansas City and look at the river or something like that.

"It was kind of like a wild story and I kind of had trouble believing what [Galloway] was telling me because he told me [he] had just got out of prison for a crime of murder, and he—"

The defense attorney immediately objected to the officer's statement and moved to strike the testimony. The court sustained the objection and expressed concern that the jury may have heard the statement and may believe that Galloway had indeed been previously convicted of murder. The defense attorney informed the judge that she did not want to request a mistrial and requested the prosecutor suggest a curative measure. The prosecutor suggested that the court inform the jury that Galloway had not been previously convicted of murder. The defense attorney agreed to the suggestion.

During the State's redirect examination, Hudson stated that a computer check revealed that Galloway had not served time for murder. After Hudson concluded his testimony, the judge instructed the jury:

"Members of the jury, the last witness indicated that the defendant gave a statement to him and I had ruled that that statement was inadmissible for several reasons.

"The officer before—the officer stated the statements as to what the defendant had told him or at least what this officer testified that the defendant had told him and there was an objection made and I sustained that objection.

"It is [the defense attorney's] concern that was heard by the jury and because of that, I am going to give you the following information. That statement that was alleged [was] made by the defendant to the officer is not, in fact, true; and to that end, you should disregard that statement if, in fact, even if it were true but it isn't true so if any of you heard part of the officer's statement as to what the individual had told him, the State has concurred in that it is not a fact and did not occur—not that the fact that it wasn't said—that's what the officer testified to—but the fact that it actually happened. Thank you."

Upon reconsideration, the defense counsel moved for a mistrial. The court denied the motion. The defense attorney then requested that the court explicitly instruct the jury that Galloway had never been convicted of the crime of murder. The judge agreed and orally instructed the jury:

"The last officer was going to testify that Mr. Galloway had told him in the stop in Kansas City that . . . Mr. Galloway had told him he had been convicted of murder and that he had done time for murder. That's what he was going to testify to. Whether that statement was made or not is irrelevant. The fact is it's not true. Mr. Galloway hasn't been convicted of murder and we have decided based on the defendant's request that some of the jurors may have heard that in spite of that instruction. It is not to be considered, and in fact, has not happened. Mr. Galloway hasn't been convicted of murder."

At the close of evidence, the judge included in his written instructions to the jury the following statements:

"There has been testimony that the defendant stated to a Kansas City, Kansas police officer that he had previously been imprisoned for the crime of murder. "The state's attorneys and defendant's attorney stipulate that the defendant has not been incarcerated for or convicted of murder. This alleged statement is not to be considered by you in deciding this case."

First, Galloway contends that logic requires a finding that a violation of an order in limine is so prejudicial that no curative instruction could have overcome the taint inflicted on the jury by that testimony. In other words, he argues that the violation of an order which is designed to prevent prejudice is, necessarily, prejudicial.

While it is true that an order in limine excludes evidence that, if admitted, would tend to prejudice the jury, it is not true that a violation of the order always results in prejudice that cannot be cured. A two-part test evaluates alleged violations of a motion in

limine. First, there must be a determination that there was a violation of the order in limine. Second, if the order in limine is violated, there must be a determination that the testimony elicited in violation of the order substantially prejudiced the defendant. The burden is on the defendant to show he or she was substantially prejudiced. *State v. Warden*, 257 Kan. 94, 125-26, 891 P.2d 1074 (1995). The statement made by Galloway that he had been imprisoned for murder was false. The fact the jury was instructed the statement was false significantly lessens the likelihood that the jury was prejudiced by the statement.

However, Galloway also argues that the prejudice which resulted from the statement was not the inference that he was a previously convicted murderer, it was an inference that he was a liar because he had told the police a falsehood. Galloway points out that he testified immediately following the offending statement and that his credibility was a significant issue at trial.

We have previously evaluated the prejudice caused by a violation of an order in limine on several occasions. In *Massey*, 242 Kan. 252, the defendant moved for a mistrial after a State's witness violated an order in limine precluding testimony that a hole in the bedspread which covered the murder victim was caused by a bullet. The cause of the hole in the bedspread was significant because there were no powder burns surrounding the gunshot wound to the victim, which meant either that the gun was fired at least 2 feet away from the victim, consistent with Massey's testimony that the victim was accidently shot when Massey experienced a seizure, or that a barrier had been intentionally placed between the gun and the victim. No tests had been conducted to determine whether a bullet created the hole in the bedspread. The bedspread was admitted into evidence under an agreement that the jury would draw its own conclusions concerning the hole.

The State cautioned its witnesses not to state an opinion as to what caused the hole. However, upon the State's questioning the witness as to whether the bedspread was torn or tattered or had any markings, the witness testified that there " 'appeared to be a bullet hole through the bedspread.' " 242 Kan. at 263. After Massey's objection, the State elicited from the witness that because no

tests had been conducted on the bedspread, his testimony regarding the hole in the bedspread was based on speculation. 242 Kan. at 263. Because the State had been careful to point out to the jury that the witness was only stating his opinion, the trial court denied Massey's motion for a mistrial.

Later, in closing argument, the State argued to the jury that the lack of powder burns on the victim could have been caused by a barrier placed between the body and the gun. To reinforce the barrier theory, the prosecutor noted there was no evidence as to what had caused the hole in the blanket.

The *Massey* court found that no reasonable person would agree with the trial court's determination that the facts elicited by the State after the violation made it possible to proceed without substantial injustice to Massey. It found that the trial court had abused its discretion in failing to grant a mistrial. 242 Kan. at 265.

In *State v. McClanahan*, 259 Kan. 86, 910 P.2d 193 (1996), defendant appealed his first-degree murder conviction claiming that the trial court erred by failing to instruct the jury on lesser included offenses and that admitting evidence of the defendant's prior abuse of a person, not the victim, was improper. The defendant's first conviction was overturned.

At retrial of the case, the prosecutor omitted the defendant's prior abuse of his wife until cross-examination of the defendant. The prosecutor asked the defendant if it was true that his wife had left him because he had beaten her. Before the defendant answered the question, the judge sustained defense counsel's objection. The prosecutor then proceeded to elicit from the defendant that defendant wanted the jury to believe his wife left him because she was seeing another man. The defendant acknowledged that his wife did not leave him because she was seeing another man. The prosecutor again attempted to elicit from the defendant the reason his wife left him. The trial court sustained the defendant's objection. The defendant was again convicted of first-degree premeditated murder.

The defendant appealed his second conviction. The State contended that the defendant had opened the door for the State to present testimony regarding prior abuse by leading the jury to er-

roneously believe that the defendant's wife had left him for another man. To support its argument, the State pointed out that various witnesses had testified that the defendant's wife was involved in a relationship with the victim. The State questioned why the defendant could insinuate to the jury that his wife left him for another man when the truth was that she left him because he had previously beaten her.

The second *McClanahan* court again stated that the evidence of defendant's prior abuse of his wife was inadmissible. The court noted that the judge in the second trial had sustained the defendant's objection before the defendant answered the prosecutor's question and that there was no other reference by the prosecution to the defendant's abuse of his wife during the trial. In addition, the defendant had been given the opportunity for a cautionary instruction to the jury, and he declined the giving of that instruction. It determined that the mere mention of the prior abuse by the prosecutor did not substantially prejudice the defendant's right to a fair trial. The second *McClanahan* court held that under these circumstances, the trial court did not abuse its discretion in denying the defendant's motion for a mistrial. 259 Kan. at 98.

In *Warden*, 257 Kan. 94, the court granted defendant's motion in limine to preclude the State from mentioning the defendant's suicide attempt. During a witness' testimony at trial, the witness indicated that she had visited the defendant in the hospital. The prosecutor asked the witness what happened while she there. The witness related the defendant's suicide attempt. The defendant objected and moved for a mistrial based on the breach of the order in limine. The court instructed the jury to disregard the last statements of the witness. Defendant moved for a mistrial. The State argued that the witness' testimony concerning the suicide attempt was unexpected. The trial court denied the defendant's motion for a mistrial, finding that the violation was neither intentional nor so prejudicial as to require a mistrial.

On appeal, Warden, citing *Massey*, argued that the trial court should have granted a mistrial under K.S.A. 22-3423(1)(c) because the prejudicial conduct made it impossible to proceed with the trial without injustice to the defendant. Warden asserted that the men-

tion of his suicide attempt to the jury was highly prejudicial, and the implication of the testimony was that he attempted suicide because he was guilty.

The *Warden* court distinguished *Massey* based on the facts. It noted that in *Massey*, the trial court did not instruct the jury to disregard the inadmissible statements of the witness; whereas in *Warden*, the trial court instructed the jury to disregard the answers of the witness. Furthermore, the trial court gave a limiting instruction that did not highlight the inadmissible testimony and found that information regarding the defendant's suicide attempt was not a prejudicial inference that the defendant attempted suicide because he was *guilty* of the crime *charged* but attempted suicide merely because he had been charged with the crime. Therefore, Warden had failed to show that the trial court abused its discretion in concluding that he was not substantially prejudiced by the breach of the order in limine. 257 Kan. at 127.

Here, the violation of the order in limine was not intentionally caused by the State, as in *Massey*, 242 Kan. 252. The violation was a nonresponsive answer of a State's witness during defendant's cross-examination. Galloway requested, and the judge gave, an instruction which, because of the nature of the statement, necessarily highlighted the inadmissible testimony. The prejudice claimed by Galloway is that the jury was instructed that Galloway had lied to the police.

The standard by which violations of an order in limine are judged is whether the offending testimony substantially prejudiced the defendant and affected the defendant's right to a fair and impartial trial. *Donesay*, 265 Kan. at 88. The determining factor in Galloway's trial was credibility: The jury had to decide whether to believe Kahle or whether to believe Galloway. Although the taperecording infers that Galloway was involved with the murder of Floyd White, there are no specific admissions by Galloway of guilt on the tape. Galloway argues that because there are no admissions, the tape is susceptible to the inference that Galloway was merely reviewing with Kahle his version of the events on the day of the killing to assure that they would avoid the appearance of guilt. We disagree. The taperecording of Galloway's conversation with Kahle provides

substantial evidence of Galloway's guilt. The violation of the order in limine, by itself, did not prejudice Galloway's right to a fair and impartial trial.

Galloway finally argues that the erroneous admission of the victim's character plus the erroneously admitted information that Galloway had lied to the police prejudiced his right to a fair and impartial jury. Cumulative trial errors, when considered collectively, may be so great as to require reversal of a defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. *State v. Allison*, 259 Kan. 25, 37-38, 910 P.2d 817 (1996) (citing *State v. Lumbrera*, 252 Kan. 54, 57, 845 P.2d 609 [1992]). If so, this court must order a new trial.

After considering the trial errors collectively, we have determined the errors did not substantially prejudice the defendant; therefore, the defendant received a fair trial.

Affirmed.