No. 71,447

STATE OF KANSAS, *Appellee*, v. CHRISTOPHER J. ALLISON,
*Appellant*.
(910 P.2d 817)

Opinion filed January 26, 1996.

*Benjamin C. Wood*, special appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*James T. Pringle, Jr.*, county attorney, argued the cause, and *Carla J. Stovall*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: This first-degree murder case considers defendant Christopher J. Allison's four contentions that: (1) the district court erred in instructing the jury concerning the testimony of a witness who receives benefits from the State; (2) the State's service of notice of intent to seek the hard-40 sentence under K.S.A. 1992 Supp. 21-4624(1) was not proper; (3) the district court erred in admitting as rebuttal, the testimony of the attorney who represented an accomplice in plea bargain negotiations; and (4) he did not receive a fair trial because of cumulative error.

Allison was convicted in a jury trial of first-degree premeditated murder, K.S.A. 1992 Supp. 21-3401, a class A felony, conspiracy to commit first-degree murder, K.S.A. 21-3302, a class C felony, and terroristic threat, K.S.A. 21-3419, a class E felony. He received a life sentence without the possibility of parole for 40 years for first-degree murder. The jury decided that aggravating circumstances existed (*i.e.*, Allison committed the crime to avoid or prevent a lawful arrest or prosecution). The hard-40 sentence was imposed consecutive to a term of 22 to 85 years, the aggregate sentence for the additional crimes Allison pled guilty to or was convicted of by the jury. Our jurisdiction is under K.S.A. 1994 Supp. 22-3601(b)(1) (a class A felony imposing a life sentence).

We find no error and affirm.

## FACTS

Allison, Jason Topper, Patrick Thomas, and Tammy Hotchkin burglarized the home of Hotchkin's father and stepmother in Arkansas City while her father and stepmother were at church. The burglars had cased the home and expected to find a safe when they returned; however, the safe had been moved. Allison was upset. He thought Hotchkin may have tipped off her father. A day or two after the Hotchkin burglary, Allison, Topper and Thomas burglarized the Hanshaw home in Winfield. Hotchkin wanted to participate in the Hanshaw burglary, but Allison would not let her. Allison was concerned that Hotchkin might report the burglaries to the police. Allison spoke with Thomas and Topper about killing Hotchkin.

A coin flip was used to decide that Thomas would do the shooting and Topper would be the backup. During a stop at a Wal-Mart store early in the evening of February 25, 1993, Allison selected flashlight batteries and rope. He said the rope would not "break" in the water. Topper picked up engine oil and paid for all the items. Upon returning to Topper's trailer home, Allison announced that he, Thomas and Topper were going out to the river to shoot guns. Hotchkin, who was there, asked if she could go along. Topper drove the group late that evening to a spot near the Walnut River southeast of Winfield. They walked to the bank of the river. Thomas had a .12 gauge shotgun. According to Thomas and Topper, as the group stood on the bank, Thomas said, "Chris." Allison then took the shotgun from Thomas and told Hotchkin to shine her flashlight at the river where some empty cans had been thrown for target practice. As Hotchkin pointed the flashlight toward the cans, Allison stepped behind her and fired the fatal shot at the back of her head. Allison, Thomas and Topper used the rope to attach window weights from Topper's pickup to her body. They removed her leather jacket and pushed her body in the river. Allison threw the shotgun into the river.

Allison, Thomas, and Topper picked up Wendy Williams and returned to Topper's trailer home. Rebecca Topper (Topper's wife and Allison's sister) and Anthony Kelly were there. Allison said "Pat [Thomas] chickened out," and then proceeded to describe the murder. Allison was afraid Hotchkin would tell "the cops" about the burglaries. He threatened that if anyone told what had happened, he would "take everybody out before he went down." Anthony Kelly called his parole officer early the next morning to report what he had heard.

Allison, Topper, Thomas and Wendy Williams pawned Hotchkin's leather jacket in Wichita. On the trip back to Winfield, they placed a sack containing the unused portion of the rope, gloves worn the night of the murder, plastic gloves used in cleaning Hotchkin's leather jacket, and Hotchkin's personal items in a dumpster. The authorities recovered the sack.

Topper and Thomas named Allison as the shooter in statements taken by the police. Topper identified the murder site. Hotchkin's

body and the murder weapon were recovered. Topper and Thomas negotiated plea bargains with the State in which the first-degree murder and aggravated kidnapping charges against them were dismissed. Before trial, Allison pled guilty to several theft and burglary charges and an unlawful possession of a firearm charge.

Topper and Thomas identified Allison at trial as the shooter. Several items of physical evidence, including the murder weapon and sack recovered in the dumpster, were introduced. Rebecca Topper and Anthony Kelly related Allison's description at the Topper home of his role in the murder. Wendy Williams, under a grant of immunity, testified that Allison, on the night of the murder, said he shot Hotchkin. Allison testified on his own behalf. Allison's testimony was largely consistent with that of Topper and Thomas, except about who pulled the trigger. Allison admitted going to the river to shoot guns, but claimed that Thomas shot Hotchkin when Allison slipped and fell in front of Hotchkin and she began laughing at Allison.

## DISCUSSION

### A Witness Receiving Benefits From the State—
### the Jury Instruction

At trial, Allison requested what he characterized as a modified instruction from PIK Crim. 3d 52.18-A:

> "You should consider with caution the testimony of a witness who gives testimony in exchange for benefits from the state.
>
> "You have heard the testimony of (Jason Topper and Patrick Thomas). He is providing evidence for the state in exchange for a promise from the state. He told the government what he would testify to in exchange for this promise. Alternatively, the state may present the testimony of someone who has been promised favorable treatment in his own case in exchange for his testimony. Some people in this position are entirely truthful when testifying. Still, you should consider the testimony of ____ with more caution than the testimony of other witnesses. He may have had reason to make up stories or exaggerate what others did because he wanted to strike a good bargain with this state about his own case. In deciding whether you believe ____'s testimony, you should keep these comments in mind."

The district court refused to give Allison's requested instruction and instead gave the following Instruction No. 18:

"You should consider with caution the testimony of a witness who, in exchange for benefits from the State, testifies in behalf of the State, if that testimony is not supported by other evidence."

PIK Crim. 3d 52.18-A (Testimony of an Informant—For Benefits) provides:

"You should consider with caution the testimony of an informant who, in exchange for benefits from the State, acts as an agent for the State in obtaining evidence against a defendant, if that testimony is not supported by other evidence."

The district court, without any objection from Allison, also gave Instruction No. 17 based on PIK Crim. 3d 52.18 (Testimony of an Accomplice):

"An accomplice witness is one who testifies that he was involved in the commission of a crime with which the defendant is charged. You should consider with caution the testimony of an accomplice."

PIK Crim. 3d 52.18-A arises from *State v. Novotny*, 252 Kan. 753, 760, 851 P.2d 365 (1993): "We conclude that ordinarily it is error to refuse to give a cautionary instruction on the testimony of a paid informant or agent where such testimony is substantially uncorroborated and is the main basis for defendant's conviction."

Instructions 17 and 18 address separate concerns regarding witness reliability. An accomplice has incentive to minimize involvement in the crime and maximize the culpability of the others involved. "When an accomplice testifies, and whether that testimony is corroborated or not, the better practice is for the trial court to give a cautionary instruction." *State v. Moore*, 229 Kan. 73, 80, 622 P.2d 631 (1981). The informant has incentive to strengthen testimony against the accused, because the informant has received benefits for that testimony. Both incentives were operating here. Thomas and Topper were accomplices. In addition, they had entered into plea bargains and agreed to testify in exchange for having the first-degree murder and aggravated kidnapping charges dropped.

The district court's Instruction 18 is a modification of PIK Crim. 3d 52.18-A.

We have recently observed:

"The pattern jury instructions for Kansas (PIK) have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions. They should be the starting point in the preparation of any set of jury instructions. If the particular facts in a given case require modification of the applicable pattern instruction or the addition of some instruction not included in PIK, the trial court should not hesitate to make such modification or addition. However, absent such need, PIK instructions and recommendations should be followed." *State v. Whitaker*, 255 Kan. 118, Syl. ¶ 1, 872 P.2d 278 (1994).

Allison argues that Instruction 18 nullifies Instruction 17. He contends that the corroborating physical evidence introduced at trial did not establish who the shooter was, and the corroborating evidence of who the shooter was consisted of testimony from another State's witness who received benefits. Thus, Instruction 18 told the jury to consider with caution the subject testimony "if that testimony is not supported by other evidence," whereas Instruction 17 told the jury to "consider with caution the testimony of an accomplice." Allison believes that the jury could have disregarded the caution given in Instruction 17 because there was corroborating evidence for Topper's and Thomas' testimony.

During the jury instructions conference, the State objected to Instruction 18, stating: "It's the State's position that that cautionary instruction only applies to paid informants and that no witnesses for the State could be considered paid informants." Allison's counsel said:

"Your Honor, the defendant had requested an instruction along the line of Instruction Number 18, which was simply more expansive; and we—At the conclusion of our discussion about the specific instructions, we'll ask that that instruction be submitted in lieu of Instruction 18."

The district court considered Allison's counsel's comments as an objection and overruled the objections of both counsel. The district court was not made aware of the asserted contradiction between Instructions 17 and 18 advanced by appellate counsel before this court.

Both Instructions 17 and 18 are based on PIK Crim. 3d 52.18 and 52.18-A. Each addresses separate credibility concerns: the accomplice's incentive to point the finger at someone else (17), and the witness' incentive to receive benefits to strengthen "bargained-

for" testimony (18). While Instruction 18 could be considered duplicative, since the jury was already cautioned about accomplice testimony, it does address the separate credibility issue concerning testimony of a witness who has plea bargained and received benefits from the State.

"When reviewing challenges to jury instructions, the instructions are to be considered together and read as a whole without isolating any one instruction. If the instructions properly and fairly state the law as applied to the facts in the case, and if the jury could not reasonably have been misled by them, then the instructions do not constitute reversible error although they may be in some small way erroneous. *Whitaker*, 255 Kan. 118, Syl. ¶ 3.

The trial court did not err in instructing the jury.

### The State's Notice of Intent to Seek the Hard 40

Allison claims that he was not served with a copy of the State's Notice of Intent to Seek the hard 40 at the time of his arraignment. K.S.A. 1992 Supp. 21-4624(1) states:

"If a defendant is charged with murder in the first degree, the county or district attorney shall file written notice if such attorney intends, upon conviction or adjudication of guilt of the defendant, to request a separate sentencing proceeding to determine whether the defendant should be required to serve a mandatory term of imprisonment of 40 years. *Such notice shall be filed with the court and served on the defendant or the defendant's attorney at the time of arraignment.* If such notice is not filed and served as required by this subsection, the county or district attorney may not request such a sentencing proceeding and the defendant, if convicted of murder in the first degree, shall be sentenced as otherwise provided by law, and no mandatory term of imprisonment shall be imposed hereunder." (Emphasis added.)

At his arraignment hearing on July 6, 1993, Allison entered "not guilty" pleas to all charges. Immediately after Allison entered his plea of "not guilty" on the last charge (terroristic threat), the following discussion took place:

"THE COURT: Mr. Pringle, Go ahead.

"MR. PRINGLE: Your Honor, I would ask that the record reflect that the State of Kansas through myself, Jim Pringle, Cowley County Attorney, is serving upon the defendant notice that the State of Kansas intends upon conviction or adjudication of guilt of the defendant of the crime of premeditated murder to request a separate sentencing proceeding to determine whether the defendant should be required to serve a mandatory term of imprisonment forty years, pursuant to

K.S.A. 1992 Supplement 21-42 *et seq.* [21-4624(1)]. I'm filing a copy of the same showing said service with the Court.

"THE COURT: All right, Mr. Allison, the County Attorney has just served you with notice of his intent to seek a mandatory imprisonment term of forty years if you are convicted of the crime of premeditated murder. Do you understand that that's what he's requesting at this time, the opportunity to present evidence to impose that sentence?

"THE DEFENDANT: Yes.

"THE COURT: Have you discussed that with Mr. Krusor, your counsel?

"THE DEFENDANT: Yes.

"THE COURT: And he's explained to you the procedure and your exposure to the mandatory term of imprisonment of forty years if you are convicted of the crime charged in Count XIII, which is murder in the first degree. Is that correct?

"THE DEFENDANT: Yes.

"THE COURT: And you've discussed that with him?

"THE DEFENDANT: Yes.

"THE COURT: And the filing of the notification of intent by the County Attorney to seek that sentence has no effect upon your plea. Is that correct?

"THE DEFENDANT: Yes.

"THE COURT: If that notice had been filed prior to the time you had entered your not guilty pleas, would your not guilty pleas have been any different?

"THE DEFENDANT: No.

"THE COURT: You intended to plead not guilty to all of these charges, knowing that this notification of intent to seek the mandatory term of forty years would be filed. Is that correct?

"THE DEFENDANT: Yes.

'THE COURT: Is that your understanding of it, Mr. Krusor?

"MR. KRUSOR: It is, Your Honor.

"Your Honor, may I address the Court with respect to the trial date?

"THE COURT: You may, sir."

Allison contends that his arraignment was completed at the moment he entered his last plea. Because he did not receive the notice until after that moment (although the judge, attorneys, and defendant were still present and on the record), he argues the notice is invalid under K.S.A. 1992 Supp. 21-4624(1). The State asserts that the arraignment is not concluded until the judge so indicates. Both parties cite *State v. Deavers*, 252 Kan. 149, 843 P.2d 695 (1992), *cert. denied* 125 L. Ed. 2d 676 (1993) as authority for their respective positions. *Deavers* was reaffirmed in *State v. Johnson*, 255 Kan. 140, 155, 871 P.2d 1246 (1994), and *State v. Peckham*, 255 Kan. 310, 318, 875 P.2d 257 (1994). *Deavers* is factually distin-

guishable. Deavers was not served with the hard-40 notice until the afternoon after his arraignment. At a morning arraignment, Deavers pled not guilty and requested a jury trial, and the trial date was set. Before concluding the hearing, the judge asked if anything else needed to be accomplished. Both the prosecutor and Deavers' counsel said no. Later that day, at the prosecutor's request, Deavers, his attorney, and the prosecutor appeared before the judge. The prosecutor advised that she had forgotten to give Deavers a copy of the notice regarding the hard-40 at the earlier hearing and handed a copy to Deavers. Deavers' counsel objected to the notice as untimely. The judge allowed the notice. On appeal of the conviction and hard-40 sentence, we vacated the sentence, deciding that the notice requirement in K.S.A. 1991 Supp. 21-4624(1) was mandatory. .

Here, Allison was served with notice before the judge had concluded the arraignment hearing. The record shows notice was filed with the court at the same time.

We have defined arraignment as

" 'the formal act of calling the defendant before a court having jurisdiction to impose sentence for the offense charged; informing the defendant of the offense charged by reading the complaint, information or indictment or stating to him the substance of the charge; and asking defendant whether he is guilty or not guilty or to otherwise plead as permissible by law.' " *State v. Smith*, 247 Kan. 455, 458, 799 P.2d 497 (1990) (quoting *State v. Rosine*, 233 Kan. 663, Syl. ¶ 3, 664 P.2d 852 [1983]).

K.S.A. 1992 Supp. 22-3205(a) provides:

"Arraignment shall be conducted in open court and shall consist of reading the complaint, information or indictment to the defendant or stating to the defendant the substance of the charge and calling upon the defendant to plead thereto. The defendant shall be given a copy of the indictment or information before the defendant is called upon to plead. Except as provided in subsection (b), if the crime charged is a felony, the defendant must be personally present for arraignment; if a misdemeanor, with the approval of the court, the defendant may appear by counsel. The court may direct any officer who has custody of the defendant to bring the defendant before the court to be arraigned."

Interpretation of a statute is a question of law. *State v. Donlay*, 253 Kan. 132, Syl. ¶ 1, 853 P.2d 680 (1993). The issue of statutory

construction is subject to a standard of unlimited review. *Davis v. City of Leawood*, 257 Kan. 512, 517, 893 P.2d 233 (1995).

The general rule is that a criminal statute must be strictly construed in favor of the accused, which means that words are given their ordinary meaning. Any reasonable doubt about the meaning is decided in favor of anyone subjected to the criminal statute. *Donlay*, 253 Kan. 132, Syl. ¶ 3. The rule of strict construction, however, is subordinate to the rule that judicial interpretation must be reasonable and sensible to effect legislative design and intent. *State v. Tyler*, 251 Kan. 616, Syl. ¶ 15, 840 P.2d 413 (1992). Our function is to interpret statutes to effect the intention of the legislature. *State v. Richardson*, 256 Kan. 69, 77, 883 P.2d 1107 (1994) (quoting *State ex rel. Stephan v. Kansas Racing Comm'n*, 246 Kan. 708, 719, 792 P.2d 971 [1990]). Generally, statutes are construed to avoid unreasonable results. 256 Kan. at 77.

K.S.A. 1992 Supp. 21-4624(1) requires that the notice be served on the defendant "at the time of arraignment." A defendant could not make an informed decision about a plea without receiving such notice. The recommended practice is to serve the notice upon the defendant before a plea is entered.

We were requested in *Richardson* to characterize as invalid the K.S.A. 1993 Supp. 21-4624(1) hard-40 notice provision served on Richardson before her arraignment. We refused such a "hyperliteral" interpretation. 256 Kan. at 77. The notice provision "serves the purpose of alerting a defendant to a hard-40 prospect so that he or she may plan strategy accordingly." 256 Kan. at 76-77.

Allison had entered his pleas to all charges when the prosecutor served him with the notice. However, the judge had not left the bench or concluded the hearing. The judge asked Allison if: (1) he had discussed the notice with his attorney and if his attorney had explained what it meant (Allison said that he had); (2) the notice would cause him to change any of his pleas (Allison said that it would not); and (3) he had intended to enter his pleas, knowing that the hard-40 notice would be filed (Allison stated that he had so intended). The judge also confirmed with Allison's counsel Allison's intention to plead not guilty. Allison's counsel did not object to the notice. He asked that the trial date be extended beyond 90

days from the arraignment date, in part, because this was the first hard-40 case in Cowley County. The judge granted the requested extension.

The record reflects that Allison knew the State intended to seek the hard-40 sentence before entering his pleas. In addition, while all parties were still present and on the record and before the trial date was set, the judge afforded Allison the opportunity to reconsider his pleas. Allison was not surprised by the notice.

The term "time of arraignment," as a matter of common sense, includes the period when the defendant appears before the court for the arraignment, the court informs the defendant of the offense charged, and the court decides that the defendant has made a fully informed decision concerning his plea. Allison was free to change his plea as if it had not yet been entered or accepted by the court. The court was still in the process of informing Allison of his rights. The jury trial date had not yet been set. Allison's hard-40 notice was served at the "time of arraignment" within the meaning of K.S.A. 1992 Supp. 21-4624(1).

## The State's Rebuttal

The State called in rebuttal William Muret, the attorney who represented Jason Topper during his plea bargain negotiations. Allison characterizes Muret's testimony as improper bolstering of Topper's testimony. The State asked Muret to describe the terms of the plea bargain as Muret explained them to Topper. The terms provided that the first-degree murder and aggravated kidnapping charges would be dropped, Topper would plead guilty to other charges, waive his Fifth Amendment rights and testify truthfully in Allison's trial. During Allison's cross-examination of Topper, Allison's counsel repeatedly suggested that as part of the plea bargain, Topper was to testify "the way you have today" (inferring that Topper agreed to testify to whatever the prosecutor wanted, regardless of the truth) in exchange for the guilty pleas and dropping the most serious charges. During recross of Topper, Allison's counsel raised the inference that during the plea bargain negotiations, Topper was attempting to strike the best deal.

The State also called Muret to testify that from the beginning of Muret's representation of Topper, Topper had consistently asserted to Muret that Allison, not Thomas, had killed Hotchkin. (Topper had waived his attorney-client privilege.)

During Topper's direct testimony, Topper testified for the State that "I seen Chris [Allison] step back and shoot Tammy." During cross-examination, Topper was asked about a prior statement he made in court at the time he was attempting to have his plea bargain accepted by the court. Allison's counsel referred Topper to the transcript of the hearing, which showed that the judge had asked Topper "And who fired the shot?" and Topper first had answered "Pat," then corrected himself. Although Topper first denied having answered the judge's question that way, Allison's counsel then asked the following question, and Topper responded:

"Q. Okay. What I suggest to you, Mr. Topper, happened is that the judge asked you the question; you said 'Pat', and then you remembered that's not what you were suppose[d] to say. You were suppose[d] to say 'Chris', correct?
"A. Chris, yes."

Allison's counsel was implying that in truth, Thomas shot Hotchkin, but Topper had agreed to falsely testify as part of his plea bargain that Allison shot Hotchkin.

Rebuttal evidence is limited to issues placed in conflict by the adverse party. *Enlow v. Sears, Roebuck & Co.,* 249 Kan. 732, 742, 822 P.2d 617 (1991). " 'The use and extent of rebuttal rests in the sound discretion of the trial court and its ruling will not be reversed unless it appears the discretion has been abused to a party's prejudice.' " *State v. Richard,* 235 Kan. 355, 360, 681 P.2d 612 (1984) (quoting *State v. Weigel,* 228 Kan. 194, Syl. ¶ 9, 612 P.2d 636 [1980])."

The State contends that this rebuttal evidence was needed to rehabilitate or corroborate Topper's direct testimony that Allison shot Hotchkin. Allison's counsel had impeached Topper by attacking his credibility in two respects: (1) Topper had an incentive to fabricate his testimony that Allison shot Hotchkin, if that is what the State wanted him to say, to work out the best possible deal on his plea bargain; (2) Topper made a prior inconsistent statement

when he answered the judge's question at his plea bargain hearing, first saying that Thomas shot Hotchkin and then correcting his answer, saying that Allison did the shooting.

Topper was impeached with his prior inconsistent statement when he admitted to Allison's counsel during cross-examination that he had first answered the judge's question by saying that Thomas shot Hotchkin. The State was then entitled to bring in corroborating evidence. Muret's testimony as to the terms of the plea bargain countered Allison's inference that Topper had agreed to testify as the State directed him, as opposed to what the truth was. Muret also testified as to statements Topper made before the plea bargain which were consistent with his trial testimony that Allison shot Hotchkin.

Muret was not asked to give any opinion concerning his own understanding or investigation of the facts. Muret only testified about prior consistent statements he heard his client make before negotiation of the plea bargain and his explanation of the terms of the plea bargain to his client. We find no abuse of discretion. See *Richard*, 235 Kan. at 362 (rebuttal testimony of attorney who represented an impeached witness in her plea bargain held admissible in defendant's murder trial).

## Cumulative Error

Allison contends he was denied a fair trial because of cumulative error. We do not agree. In arguing that the "cumulative trial error" rule applies, Allison refers to the other issues raised in his appeal "together with repeated, improper references to Mr. Allison's prior incarcerations. See also K.S.A. 60-455." Allison identified three occasions during the State's case when inadvertent references were made to Allison's prior criminal record. On each occasion, the trial court sustained counsel's objection or motion to strike and directed the jury to disregard the testimony. Allison also contends that the evidence against him was not overwhelming. The State made no response to Allison's cumulative error argument. We have held that cumulative trial errors, when considered collectively, may be so great as to require reversal of a defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the

defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant. *State v. Lumbrera*, 252 Kan. 54, Syl. ¶ 1, 845 P.2d 609 (1992). Allison received a fair trial.

The evidence against Allison was overwhelming. The two accomplices both testified that he planned the murder with them and shot Hotchkin in their presence. Several persons, including Allison's girlfriend, his sister, and Anthony Kelly, heard Allison admit after the murder that he had shot Hotchkin. Allison admitted being involved in the murder and the disposal of the body, although he claimed Thomas fired the murder weapon. The weapon was recovered. The body was recovered, bound and weighted as described by Thomas and Topper. Items of clothing, rubber gloves, and other property implicating Allison, Thomas, and Topper were retrieved.

Affirmed.