IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 116,568

STATE OF KANSAS,
*Appellee*,

v.

MARQUEL D. DEAN,
*Appellant.*

SYLLABUS BY THE COURT

1.

An appellant has the burden to furnish a record that affirmatively shows prejudicial error, and without such a record, an appellate court presumes the actions of the district court were proper.

2.

A district court is not legally required to instruct the jury to view with caution the testimony of a noninformant witness who is testifying in exchange for benefits from the State.

3.

To grant a motion for new trial based on newly discovered evidence, a district court must determine that (1) the defendant has met the burden of establishing that the newly proffered evidence could not, with reasonable diligence, have been produced at trial, and (2) the evidence is of such materiality that it would be likely to produce a different result upon retrial.

4.

On these facts, gang affiliation evidence was relevant to prove the disputed facts of identity, motive, and premeditation; it was probative to explain otherwise inexplicable events surrounding the murder; and it was not unduly prejudicial because the district court gave a proper limiting instruction.

Appeal from Sedgwick District Court; JEFFREY SYRIOS, judge. Opinion filed October 25, 2019. Affirmed.

*Carl F.A. Maughan*, of Maughan Law Group LC, of Wichita, argued the cause and was on the brief for appellant.

*Julie A. Koon*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.: This case arises from a retaliatory gang shooting in Sedgwick County. Marquel D. Dean, a member of the Crips, walked into a party with another Crip, and the two shot and killed a member of the Bloods. Their bullets also injured four bystanders. Dean was convicted of premeditated murder, four aggravated batteries, and criminal possession of a firearm. On direct appeal, Dean challenges: (1) the denial of his motion for mistrial based on juror misconduct; (2) the failure to instruct the jury to view with caution the testimony of a witness for benefits; (3) the denial of his motion for new trial based on newly discovered evidence; (4) the sufficiency of the evidence; and (5) the admission of gang affiliation evidence. He also claims cumulative error denied him the right to a fair trial. Holding there was no error, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In June 2013, Montreal Rambo, a member of the Crips gang, was shot in the leg while he was standing outside a restaurant in Wichita. Rambo's leg had to be amputated and from then on he used a wheelchair. The word on the street was that a member of the Bloods gang named James Gary, also known as "Bird," had shot Rambo.

About a month later, Chamay Ross, Gary's girlfriend, went out to a bar named the Drunken Monkee with her cousin, Ashley Thomas. At that time, Thomas was in a relationship with Dean, a Crip known as "Crush Tre" or "C-3." Many Crips were at the Drunken Monkee that night, including Rambo and Dean, who were close friends.

After the bar closed about 2 a.m., Ross and Thomas went to a large party in the garage of a building. Gary typically attended parties at this location, along with other Bloods. The party had about 100 attendees, and it spilled out of the garage into the parking lot. After the two women arrived, Ross spotted Gary and brought him a drink. She recalled that Gary was easy to find in a crowd because he was tall. Gary told her to leave because the Crips were coming, but she stayed. Meanwhile, Thomas kept using Ross' phone to call someone—who turned out to be Dean.

Around 3 a.m., Dean and Shane Landrum, a Crip known as "Tall Can," walked into the party together. Gary told a Bloods member next to him, "There go Crush Tre and Tall Can." When Dean and Landrum got close to Gary, shots were fired. Gary was hit four times and later died. Another burst of shots sprayed the crowd from the same direction, injuring Thomas and three others. As Dean ran away, a Folk Tru Boy gang member named Davorious Holloman shot back at him.

3

Generally, the Bloods wear red and the Crips wear blue. But Ross, along with several other witnesses, saw Dean walk into the crowd wearing a red outfit. One witness testified that Dean was wearing a plaid shirt when he first arrived but was wearing a red shirt when he approached Gary. She recalled that Gary took a "fighting position" but was not holding a gun. She said Dean shot Gary from a few feet away.

Several witnesses reported that "C-3" was the shooter or that the shooter was wearing red. Travis Rogers, a Bloods member, shook Gary's hand moments before the initial shots were fired. Rogers was shot twice in the stomach and found lying next to Gary. Rogers told a bystander that "C-3" shot him. He later testified that Dean also shot Gary.

The eyewitness and ballistic evidence revealed that three guns were fired at the party that night. Witnesses reported that Dean and Landrum fired toward Gary, and Holloman shot back while they fled. No guns were found at the scene, but law enforcement later obtained Holloman's gun in a separate case, and it matched some of the shell casings found at the scene. The bullets recovered from the victims did not come from Holloman's gun.

Dean fled the state and was apprehended in Texas. The State charged him with premeditated murder for killing Gary; four counts of aggravated battery for shooting the bystanders; and one count of criminal possession of a firearm.

The most contested witness at trial was Charles Steele, Gary's close friend and Bloods associate. At the time of trial, Steele was in federal custody for bank robbery. Steele admitted that he had pled guilty in the federal case and was hoping to get a reduced sentence for testifying at Dean's trial.

Steele explained that the rivalry between the Bloods and the Crips escalated after Rambo was shot. At the garage party, Steele was standing near Gary when the shooting started. Steele recalled that someone saw the Crips coming and tapped Gary. But, Steele testified, "[b]efore [Gary] could even try to turn and run . . . C-3 already ran and was shooting," and Holloman returned fire. Steele recalled that Dean was dressed in red when he shot Gary.

The jury convicted Dean of premeditated murder, four aggravated batteries, and criminal possession of a firearm. The district court imposed a hard 25 life sentence for premeditated murder and a consecutive 257-month sentence for the remaining crimes.

On appeal directly to this court, Dean argues the district court erred when it failed to declare a mistrial after a juror took notes outside of court; refused to instruct the jury to view with caution the testimony of a witness for benefits; and denied his motion for new trial based on newly discovered evidence about Steele's plea deal. Dean also claims the evidence of premeditation was insufficient; the evidence of gang affiliation was inadmissible; and cumulative error denied him the right to a fair trial. We exercise jurisdiction over Dean's appeal because he received a life sentence for premeditated murder. See K.S.A. 2018 Supp. 22-3601(b)(3).

ANALYSIS

*On his mistrial claim, Dean failed to designate a record that shows prejudicial error.*

Dean claims the district court erred when it denied his motion for mistrial after a juror committed prejudicial misconduct. A district court judge may order a mistrial when "[p]rejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution." K.S.A. 22-

5

3423(1)(c). Under K.S.A. 22-3423(1)(c), a district court must engage in a two-step analysis:

"First, the trial court must decide if '"there is some fundamental failure of the proceeding."' If so, in the second step of the analysis, the trial court must assess whether it is possible to continue the trial without an 'injustice.' This means . . . that if there is prejudicial conduct, the trial court must determine if the damaging effect can be removed or mitigated by an admonition or instruction to the jury. If not, the trial court must determine whether the degree of prejudice results in an injustice and, if so, declare a mistrial. [Citations omitted.]" *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011).

We review a district court's decision to deny a motion for mistrial for abuse of discretion. 292 Kan. at 550. Judicial discretion is abused if the court's action is arbitrary, fanciful, or unreasonable; based on an error of law; or based on an error of fact. 292 Kan. at 550. Dean, as the party alleging error, bears the burden of proving his substantial rights to a fair trial were prejudiced. See *State v. Foster*, 290 Kan. 696, 717, 233 P.3d 265 (2010).

Partway through jury deliberations, the presiding juror ("Juror 7") brought a notebook from home into the jury room and asked the district court if he could show his notes, taken outside trial, to the other jurors. The court dismissed Juror 7 for reasonable cause because he violated a pretrial admonition against notetaking and bringing outside material into deliberations. Then the court questioned the remaining jurors individually. Each juror denied taking notes or seeing notes taken by another juror.

As Juror 7 left the building, he handed a partially completed but unsigned verdict form to the district court's aide. The court showed the verdict form to the parties off record. Back on the record, the court said there were "two markings" on the verdict form, but, the contents were not read into the record. Thus we do not know what the "markings"

indicated. After the court showed the verdict form to the parties, defense counsel promptly moved for a mistrial.

Defense counsel argued the partial verdict form proved that prejudice occurred because Juror 7 exerted a special influence over the jury:

> "If this individual is in there and has now persuaded the jury to a certain number of facts, then they have been prejudiced by his persuading, whether it was referenced to notes or not referenced to notes, it was his contribution to the discussion that has led this jury to wherever they are at."

In other words, defense counsel claimed Juror 7 influenced the partial verdict and the jury could not "un-ring" the bell and start deliberations over.

The district court denied the motion for mistrial; replaced Juror 7 with an alternate; issued a curative instruction; ordered the new jury to start deliberations over; and sent the jury back with a new verdict form. The court believed there was no substantial prejudice because, after extensive questioning, it found no evidence that the jury was tainted by Juror 7's notetaking.

On appeal, the parties do not dispute that Juror 7 committed misconduct or that the district court had reasonable cause to dismiss and replace him. See K.S.A. 2018 Supp. 22-3412(c); *State v. Haislip*, 237 Kan. 461, 468-69, 701 P.2d 909 (1985) (holding that a district court may dismiss and substitute a juror after deliberations have begun for reasonable cause). But Dean argues the district court should have granted his motion for mistrial because the damaging effect of Juror 7's misconduct could not be mitigated. Precisely, he claims the partial verdict form—which was reached with Juror 7's input— incurably tainted the jury, and as a result, the jury could not start deliberations over with a

clean slate. Thus, the parties only dispute whether the degree of prejudice required a mistrial. See *Ward*, 292 Kan. at 550.

Crucially, the partial verdict form is not in the record on appeal. Thus we do not know what the "two markings" on the verdict form were, and we will not speculate about their impact on the jury. Dean has the burden "to furnish a record that affirmatively shows prejudicial error," and he failed to do so by omitting the partial verdict form from the record. *State v. Warren*, 302 Kan. 601, 616, 356 P.3d 396 (2015). "[W]ithout such a record, we presume the actions of the trial court were proper." 302 Kan. at 616. On these facts, we cannot conclude that Dean's substantial rights were prejudiced, and as a result, we affirm the denial of Dean's motion for mistrial.

*A jury instruction to view with caution the testimony of a witness for benefits was not legally required.*

Next, Dean argues the district court erred when it failed to instruct the jury to view with caution the testimony of a witness for benefits. At the jury instruction conference, defense counsel asked for what he called a "cooperating witness" instruction because Steele's testimony was given in exchange for the possibility of a reduced sentence in his federal case. Defense counsel did not propose specific language for the instruction but explained, "I thought there was a PIK on it. . . . [I]t's similar to the co-defendant testimony or 'a person who has worked a deal' testimony, that caution should be used with respect to evaluating their testimony." The district court denied the motion, reasoning that "there are instructions . . . that will cover how the parties are to view the testimony of all the witnesses"; "Mr. Steele was cross-examined"; and "the defense can argue . . . what they are trying to accomplish with a cautionary instruction." Defense counsel did not object to this ruling.

8

We recently summarized the stair-step analysis for jury instruction challenges:

> "'Generally, an appellate court reviewing a jury instruction challenge must determine whether the issue was preserved; whether the instruction was legally and factually appropriate; and whether any error was harmless.' *State v. Barrett*, 309 Kan. 1029, 1036-37, 442 P.3d 492 (2019). Preservation and reversibility are interrelated. When a party fails to object to a jury instruction at trial, we only reverse if the instruction is clearly erroneous, meaning, we must be "'firmly convinced that the jury would have reached a different verdict had the instruction error not occurred."'" *State v. McLinn*, 307 Kan. 307, 317-18, 409 P.3d 1 (2018)." *State v. Boothby*, 310 Kan. __, 448 P.3d 416, 424 (2019).

We apply harmless error rather than clear error when a defendant requests an instruction but does not object when it is not given. See *State v. Haygood*, 308 Kan. 1387, Syl. ¶ 8, 1404, 430 P.3d 11 (2018); *State v. Davis*, 306 Kan. 400, 418, 394 P.3d 817 (2017); and *State v. Kleypas*, 305 Kan. 224, 302, 382 P.3d 373 (2016). Here, however, Dean's request for a cooperating witness instruction was so nonspecific as to be akin to not making the request at all. In light of this, and given that Dean did not object to the district court's ruling, we review for clear error. See *State v. Brammer*, 301 Kan. 333, 334, 343 P.3d 75 (2015).

Dean's request for his "cooperating witness" instruction at trial was imprecise, but he appeared to reference the PIK instruction on informant testimony. See PIK Crim. 4th 51.100 (2017 Supp.). On appeal, Dean's appellate counsel connects the dots and analogizes the "cooperating witness" instruction he requested with PIK Crim. 4th 51.100 (2017 Supp.), which states: "You should consider with caution the testimony of an informant who, in exchange for benefits from the State, acts as an agent for the State in obtaining evidence against a defendant, if that testimony is not supported by other

9

evidence." Dean argues that the same instruction, if modified for a cooperating witness, would have been legally appropriate here.

Dean concedes that Steele—to whom the instruction was targeted—was not an "informant" under PIK Crim. 4th 51.100 because he was not investigating for the State when he observed Gary's murder. See *State v. Ashley*, 306 Kan. 642, 647-48, 396 P.3d 92 (2017) (listing "line of cases" where "this court has consistently held that the informant cautionary instruction is not required when . . . the witness had not been contacted by the State and was not intentionally given the role of investigator"). But still, Dean argues, a witness who cooperates with the State in exchange for a benefit has the same motive for biased or dishonest testimony.

Dean relies on a case from Oklahoma to argue that a cautionary instruction is required when a witness—who is not an "informant" under PIK Crim. 4th 51.100— testifies for the State in exchange for a benefit. In *Dodd v. State*, 993 P.2d 778 (Okla. Crim. App. 2000), the Court of Criminal Appeals of Oklahoma explained that the distinction between an informant who works for the State and one who does not "matters little in terms of . . . reliability or trustworthiness" because both often "relay incriminating statements to the state in expectation of benefit in exchange." 993 P.2d at 783-84. The Oklahoma court held that a cautionary jury instruction must be given when jailhouse informant testimony is admitted, even if the informant was not working for the State when procuring the incriminating statements. 993 P.2d at 784.

We have held that instructing a jury to view with caution the testimony of a witness for benefits is permissible but not legally required. In *State v. Saenz*, 271 Kan. 339, 346, 22 P.3d 151 (2001), a defendant likewise urged us to follow *Dodd* and adopt a cautionary instruction for all jailhouse informants, but we declined to do so. Instead, we affirmed the use of PIK Crim. 3d 52.18-A (2008 Supp.) (now PIK Crim. 4th 51.100) for an informant who acts as a State agent when obtaining the evidence against the

defendant. 271 Kan. at 348. On the flipside, we have also held that a district court did not err when it gave an instruction like Dean requests today: "'You should consider with caution the testimony of a witness who, in exchange for benefits from the State, testifies in behalf of the State, if that testimony is not supported by other evidence.'" *State v. Allison*, 259 Kan. 25, 29, 910 P.2d 817 (1996).

Today we affirm this caselaw. A district court is not legally required to instruct the jury to view with caution the testimony of a noninformant witness who is, nonetheless, testifying in exchange for benefits from the State. At trial, Steele admitted that he was testifying in hopes of getting a reduced sentence in his federal case; defense counsel cross-examined Steele on this point; and defense counsel hammered Steele's bias in closing argument. Thus, the jury was well aware of Steele's benefit and well-equipped to weigh his credibility without a specific cautionary instruction.

*The district court did not err when it denied Dean's motion for new trial.*

Dean argues the district court should have granted his motion for new trial because the State revealed new material evidence about the details of Steele's federal plea deal after trial. But it is important that the new documents allegedly describing the plea deal are not included in the record on appeal. The State responds that the evidence was not new or material, because Steele admitted that he had a plea deal and was testifying in exchange for a benefit.

K.S.A. 2018 Supp. 22-3501(1) provides that "on motion of a defendant" a district court "may grant a new trial to the defendant if required in the interest of justice." To grant a motion for new trial based on newly discovered evidence, a district court must determine that (1) "the defendant has met the burden of establishing that the newly proffered evidence could not, with reasonable diligence, have been produced at trial," and (2) "the evidence is of such materiality that it would be likely to produce a different result

upon retrial." *State v. Rojas-Marceleno*, 295 Kan. 525, 540, 285 P.3d 361 (2012). "While we review a district court's decision on a motion for new trial for an abuse of discretion, we review materiality decisions de novo, giving deference to the district court's findings of fact." 295 Kan. at 539. Dean bears the burden of proving the district court abused its discretion. See 295 Kan. at 539-40.

At trial, Steele testified that he hoped to receive a lesser sentence in his federal case in exchange for testifying for the State in Dean's case. On direct examination, the prosecutor questioned Steele about his expected benefit:

"[Prosecutor:] Have you entered a plea in that [federal] case yet?

"[Steele:] Yes.

"[Prosecutor:] And have you been given a plea bargain in exchange for testifying in this case?

"[Steele:] No.

"[Prosecutor:] Are you hoping that your attorney and yourself are able to use this testimony as a basis for reduction in sentence at the time of your sentencing?

"[Steele:] We hope that, yes.

"[Prosecutor:] Is it a guarantee that it's going to happen?

"[Steele:] No.

"[Prosecutor:] Do you anticipate, regardless of whether or not you get a reduction or not, that you are going to be going to prison?

"[Steele:] Yes.

"[Prosecutor:]  How long?

"[Steele:]  Anywhere from 8 to 10 years, somewhere."

Thus Steele testified that he took a plea bargain in the federal case, but not in exchange for his testimony in Dean's case. Instead, Steele was hoping to leverage his trial testimony for a lesser sentence in the federal case.

On the eve of sentencing, the defense filed a motion for new trial based on newly discovered evidence, claiming the State had withheld details about Steele's plea deal with the federal government until after trial. The motion briefly stated that Dean had received "additional discovery regarding the plea deal offered to key prosecution witness Charles Steele," but no documentation was attached.

The district court addressed the motion for new trial at the sentencing hearing. There, defense counsel entered an exhibit into evidence that contained documents the State sent him after trial, which purported to shed light on Steele's federal plea deal. The district court admitted this exhibit, but it is not included in the record on appeal. Thus, we do not know what the documents said about Steele's plea deal.

However, undisputed statements of counsel on the record suggest that, at a minimum, Steele testified in Dean's case in exchange for a "5K1" motion from the federal government, which would recommend a reduction in his sentence. A "5K1" motion refers to a motion filed under § 5K1.1 of the Federal Sentencing Guidelines, which states: "Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines." Granting a departure based on a 5K1 motion is discretionary. See *United States v. Munoz*, 946 F.2d 729, 730 (10th Cir. 1991)

13

("This language [in U.S.S.G. 5K1.1] clearly states that the district court's decision to depart is discretionary . . . . [T]he ultimate decision of whether to depart rests in the sound discretion of the district court.").

After reviewing the documents and hearing the arguments of counsel, the district court made findings that are not disputed on appeal. The district court found that it was unclear whether Steele had a plea bargain with the federal government, but, regardless, Steele admitted that he was testifying in exchange for a benefit. The district court explained:

> "I have looked at my notes on Mr. Steele's testimony. I have considered part of the transcript even on that. My understanding is he pled to that bank robbery. Whether there is a plea bargain or not, I'm not sure there—I don't know that there was. I'm not sure what his mindset was. I'm not sure that he . . . understood that there was a formal plea agreement. There may have been; there may not have been. But what I do believe—and that was based upon direct and cross-examination, but right out of the box, I think it was [the State] who was examining him, did ask, have you been given a plea bargain in exchange for testifying. His answer was no. But I think what is significant is the next question is, are you hoping that your attorney and yourself are able to use testimony as a basis for reduction in the sentence at the time of sentencing, and the answer was, we hope that, yes."

Then the district court explained that the core issue was Steele's credibility and whether he was testifying in hopes of receiving a reduced sentence. The court emphasized that "[t]he essence of what needed to be known was that there was the hope for a reduction based upon cooperative testimony, and that was known and fully known," and Steele was fully impeached on that issue. Thus, the district court ruled that the evidence presented failed both prongs of the test—it was not newly discovered or material.

14

We agree with the district court. Dean has the burden to establish that the documents describing Steele's plea deal are new, but he failed to include them in the record on appeal. See *Rojas-Marceleno*, 295 Kan. at 539-40. Thus we do not know what the alleged "new" evidence was. Moreover, the district court's undisputed findings show that (1) it was unclear whether Steele had a federal plea deal but (2) Steele testified that he hoped to receive a reduced sentence in exchange for his testimony in Dean's case. Based on these findings, we hold that evidence about Steele's plea deal was not new or material. Defense counsel cross-examined Steele about the benefit he could receive for testifying and attacked his credibility during closing argument. We agree with the district court that the essence of Steele's bias—that he was testifying for a benefit—was presented and argued at trial, and more detail about Steele's plea deal would not "be likely to produce a different result upon retrial." 295 Kan. at 540. Accordingly, we hold the district court did not abuse its discretion when it denied Dean's motion for mistrial.

*The State presented sufficient evidence of premeditation.*

Dean argues the State presented insufficient evidence of premeditation. He does not challenge the sufficiency of the other elements of first-degree premeditated murder. He claims that, at most, the State proved that Dean approached Gary, Gary took a fighting position, and then shots were fired. The State claims there was ample evidence of premeditation—Dean changed into a red shirt, ambushed Gary, and shot him at close range to avenge Rambo.

When the sufficiency of the evidence is challenged, we review all the evidence in the light most favorable to the State and determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. We do not reweigh evidence, resolve evidentiary conflicts, or determine witness credibility. *State v. Parker*, 309 Kan. 1, 14, 430 P.3d 975 (2018). We also "make[] no distinction between circumstantial and direct evidence in terms of probative value because '"[a] conviction of even the gravest

offense can be based entirely on circumstantial evidence and the inferences fairly deducible therefrom."'" *State v. Robinson*, 306 Kan. 1012, 1023, 399 P.3d 194 (2017) (quoting *State v. McBroom*, 299 Kan. 731, 754, 325 P.3d 1174 [2014]). Indeed, "direct evidence of premeditation is rare," and "the element of premeditation generally must be proven with circumstantial evidence." *State v. Hall*, 292 Kan. 841, 859, 257 P.3d 272 (2011).

Recently in *State v. McLinn*, 307 Kan. 307, 409 P.3d 1 (2018), we clarified that premeditation has a significant "temporal" component. 307 Kan. at 321. We explained, "Premeditation 'means to have thought the matter over beforehand,' meaning 'to have formed the design or intent to kill before the act.' In other words, our premeditation inquiry asks *when* the intent to kill was formed." 307 Kan. at 321. Put simply, "premeditation involves forming the intent beforehand." 307 Kan. at 322.

Traditionally, we have considered five nonexclusive factors to determine whether the State has proved premeditation: "'(1) the nature of the weapon used, (2) the lack of provocation, (3) the defendant's conduct before and after the killing, (4) threats and declarations of the defendant before and during the occurrence, and (5) the dealing of lethal blows after the deceased was felled and rendered helpless.'" *State v. Lowery*, 308 Kan. 1183, 1238, 427 P.3d 865 (2018) (quoting *State v. Marks*, 297 Kan. 131, 140, 298 P.3d 1102 [2013]). We have continued to rely on these factors since *McLinn*. See *Lowery*, 308 Kan. at 1238. The number of factors present in a given case is not determinative "because in some cases one factor alone may be compelling evidence of premeditation." 308 Kan. at 1238. But use of a deadly weapon is, by itself, insufficient to establish premeditation. 308 Kan. at 1238.

Considering these factors, along with reasonable inferences drawn from the evidence, we conclude the State presented sufficient evidence of premeditation. The most compelling factors here are lack of provocation and the defendant's conduct before the

16

killing. This was not an instantaneous killing—it was a well-planned ambush. The evidence, when viewed in the light most favorable to the State, shows that Dean formed the intent to kill Gary beforehand: Thomas called Dean from the party; Dean arrived in a plaid shirt but changed into a red one before entering the crowd; Gary was not holding a gun; Dean and Landrum approached Gary; then they shot him at close range. The State also presented evidence that Dean's gang, the Crips, was planning to retaliate against Gary for Rambo's injury. Based on this evidence, a rational fact-finder could conclude beyond a reasonable doubt that Dean premeditated Gary's murder.

*The evidence of Dean's gang affiliation was admissible.*

Before trial, defense counsel moved to exclude gang affiliation evidence. The district court denied the motion, stating:

> "The bottom line and in the final analysis this crime as alleged by the State is about gang identity, activity, affiliation, membership and motivation. It is relevant and it is material. The probative value of this evidence outweighs any resulting prejudice. Under K.S.A. 60-445 there is no unfair or harmful surprise to the defense. This case in its essence is about gang membership and affiliation."

During trial, defense counsel objected to several references to gang affiliation, and the district court overruled the objections based on its pretrial ruling. Defense counsel also requested and was granted a continuing objection during one detective's testimony. At the end of trial, the district court gave the jury this limiting instruction:

> "There has been evidence offered tending to prove gang membership and affiliation. This evidence may be used to show motive, part of the events surrounding the commission of the crime, the relationship of the parties, identification, and witness bias. This evidence shall not be considered for any other purpose."

17

On appeal, Dean argues that evidence of gang affiliation should have been excluded from trial because it was irrelevant and unduly prejudicial. He claims this evidence was not relevant to show bias or motive, and the State's gang revenge theory was speculative at best. The State counters that gang affiliation evidence was relevant to show Dean's motive to kill Gary and to explain the events surrounding the crime, and any prejudice was mitigated by the district court's limiting instruction.

Generally, gang affiliation evidence is admissible if it is relevant, meaning material and probative, and not unduly prejudicial. *State v. Peppers*, 294 Kan. 377, 388, 276 P.3d 148 (2012). We have summarized the steps to review the admission of gang affiliation evidence this way:

> "Gang affiliation evidence is admissible if relevant. Relevant evidence is defined by statute as evidence that is both material and probative. An appellate court reviews whether evidence is material under a de novo standard. Materiality addresses whether a fact has a legitimate and effective bearing on the decision of the case and is in dispute. An appellate court reviews whether evidence is probative under an abuse of discretion standard. Evidence is probative if it has any tendency to prove any material fact. Even if gang evidence or other evidence is deemed relevant, it may be excluded if it is more prejudicial than probative." 294 Kan. 377, Syl. ¶ 1.

See K.S.A. 60-401(b) ("'Relevant evidence' means evidence having any tendency in reason to prove any material fact."). "A district judge's balancing of probative value and prejudice is reviewed for an abuse of discretion." 294 Kan. at 391. The prejudicial effect of gang affiliation evidence may be cured by a limiting instruction, though a district court need not give one sua sponte. 294 Kan. at 391.

We have held that gang affiliation evidence may be relevant to show bias, prove identity, or explain an otherwise inexplicable act, but these reasons are not exclusive. See *State v. Jones*, 295 Kan. 804, 810, 286 P.3d 562 (2012) (listing cases). For example, in

18

*Peppers*, the defendant, who was chief of the Traveling Vice Lords (TVL) gang, killed a bystander when he tried to shoot a member of an associated gang, the "Solids 4," in retaliation for killing a TVL member. On appeal, we held that evidence of gang affiliation was relevant "[b]ecause Peppers defended only by holding the State to its high burden of proof beyond a reasonable doubt," and thus his identity, opportunity, and motive were in dispute. 294 Kan. at 390. We also held the evidence was probative because "[g]ang affiliation, hierarchy, and rules" explained the events that led to the bystander's death and the defendant's motive for the retaliatory shooting. 294 Kan. at 390. Finally, we held the admission of gang affiliation evidence was not unduly prejudicial because the district court

> "instructed the jury *not* to consider the gang affiliation evidence to prove 'that [Peppers] is a person of bad character or that [Peppers] has a disposition to commit crimes' and instead to consider the evidence 'only for the purpose of determining if it tends to show part of the events surrounding the commission of the crime or the motive of the person who committed the crimes, if any, of which the defendant is accused.'" 294 Kan. at 391-92.

In *Peppers* we held the gang affiliation evidence was relevant because "the shootings were gang-related," and the defendant's identity, opportunity, and motive were in dispute. 294 Kan. at 391. And the evidence was not unduly prejudicial because "the prejudicial effect of the gang evidence was limited by the district judge's jury instruction" and "the probative value side of the balance on the gang affiliation evidence had substantial weight." 294 Kan. at 391-92.

Following *Peppers*, we hold the gang affiliation evidence presented here was relevant and not unduly prejudicial. Like the defendant in *Peppers*, Dean's defense was to hold the State to its burden of proof; he did not claim self-defense. Thus gang affiliation evidence was relevant because it had a tendency to prove disputed facts, including the shooter's identity, the motive for killing Gary, and whether the shooting was

19

premeditated. Indeed, many events that surrounded Gary's death would be inexplicable without evidence of gang affiliation—like the gang feud that escalated after Rambo was shot, or the significance of Dean's red clothes. Put simply, this was a retaliatory gang shooting, not a random act of violence. Furthermore, the district court mitigated any undue prejudice to Dean by instructing the jury that evidence of "gang membership and affiliation . . . may be used to show motive, part of the events surrounding the commission of the crime, the relationship of the parties, identification, and witness bias" and "shall not be considered for any other purpose." As a result, we hold the district court did not err when it admitted evidence of gang affiliation.

Finally, Dean argues cumulative error warrants reversal. But because there are no errors to accumulate here, Dean's cumulative error claim fails. See *State v. Williams*, 299 Kan. 1039, 1051, 329 P.3d 420 (2014).

Affirmed.

JOHNSON, J., not participating.