NOT DESIGNATED FOR PUBLICATION

No. 126,465

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CHRISTOPHER J. ALLISON,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Cowley District Court; CHRISTOPHER SMITH, judge. Submitted without oral argument. Opinion filed February 20, 2026. Affirmed.

*Wendie C. Miller*, of Kechi, for appellant.

*Ian T. Otte*, deputy county attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before BRUNS, P.J., HILL and ATCHESON, JJ.

PER CURIAM: A Cowley County District Court denied Christopher J. Allison's motion for habeas corpus relief under K.S.A. 60-1507 because it was filed about 16 years late and Allison failed to establish either compelling reasons for the dilatory filing or new evidence of his actual innocence that would have permitted review of his otherwise untimely claims. We find no error in the district court's determination of those points and affirm the decision for that reason.

In 1993, a jury convicted Allison of first-degree murder with aggravating circumstances—the killing of a witness to subvert a criminal prosecution—along with

1

conspiracy to commit murder and making a terroristic threat. The district court imposed a hard-40 sentence on Allison for the murder conviction and lesser consecutive sentences for the other convictions.

An abbreviated overview of the evidence shows that Allison, Patrick Thomas, Jason Topper, and Tammy Hotchkin committed a burglary, resulting in charges against them in a separate case. Allison, Thomas, and Topper became concerned that Hotchkin might inform on them to law enforcement authorities about that and other burglaries. In early 1993, they agreed to lure Hotchkin to the Walnut River and to kill her there. They supposedly flipped coins to determine who would shoot Hotchkin with a 12-gauge shotgun they acquired for that purpose. The designated shooter (apparently Thomas) couldn't carry out his part of the plan. Allison took the shotgun and fatally shot Hotchkin in the back of the head. The three then weighed down the body and threw the body and the shotgun into Walnut River. Immediately afterward, Allison made statements to others to the effect he shot Hotchkin.

Before the trial, Thomas and Topper cut deals with the State and testified that Allison killed Hotchkin. The trial evidence included testimony from Thomas and Topper, among others, that they were housed together in jail and spoke to each other regularly. The evidence also showed that before and after his plea deal, Topper offered differing versions of his involvement in the actual killing. Initially, he claimed to be near the river, some distance from the shooting. At trial, however, he testified that he was in the immediate vicinity and saw Allison shoot Hotchkin. The jurors were well aware of Topper's discrepant accounts.

On direct appeal, the Kansas Supreme Court affirmed Allison's convictions and resulting sentences in an opinion filed January 26, 1996. *State v. Allison*, 259 Kan. 25, 910 P.2d 817 (1996). Allison filed an unsuccessful motion to correct an illegal sentence

in 2014. The Kansas Supreme Court affirmed the denial of that motion. *State v. Allison*, 306 Kan. 80, 392 P.3d 52 (2017).

Allison then filed his first and only habeas corpus motion—the matter we have before us—on November 2, 2020. By way of background, the Legislature amended K.S.A. 60-1507 in 2003 to impose a one-year deadline following completion of any direct appeal for filing a motion seeking collateral relief from a criminal conviction. Those defendants whose convictions predated the amendment—such as Allison—had one year from the amendment's effective date to file their 60-1507 motions. So Allison was 16 years late to the courthouse.

But K.S.A. 60-1507(f)(2) contains an exception to the one-year filing deadline "to prevent a manifest injustice." In turn, a manifest injustice entails either an exceptional reason for the late filing or a "colorable claim of actual innocence" based on "new evidence." K.S.A. 60-1507(f)(2)(A). In the district court, Allison attempted to meet both those criteria. The district court found his efforts unpersuasive. On appeal, Allison essentially retraces those arguments and contends the district court erred in finding no manifest injustice excusing his untimely filing.

The district court heard testimony and received other evidence bearing on the manifest injustice claim at what it characterized as a preliminary hearing on the 60-1507 motion. When a district court receives evidence at a preliminary hearing, we ask whether substantial competent evidence supports its findings and whether those findings support its ultimate legal conclusion. We examine the legal conclusion without deference to the district court. See *Bellamy v. State*, 285 Kan. 346, Syl. ¶ 4, 172 P.3d 10 (2007). But we neither reweigh the evidence generally nor make any independent assessment of credibility.

To support his claim of actual innocence, Allison presented the affidavit of Bobby Davison, who swore that he was in jail with Topper and Thomas before the trial and often saw them talking together, although he did not know what they were talking about. Assuming the admissibility of the affidavit, Davison's observations did nothing more than reiterate what witnesses at Allison's trial had testified to. It was undisputed that Topper and Thomas were housed together and, thus, had the opportunity to mesh their stories. That was a significant part of Allison's defense—Topper and Thomas identified him as the shooter to win advantageous plea deals. Davison's affidavit does not directly support a claim that Allison is actually innocent and is, at best, a string of inferences removed from such a conclusion.

The other component of Allison's actual innocence claim rested on the hearing testimony of Rebecca Hart. Hart is Allison's sister and at the time of the killing and trial in 1993 was married to Topper. Hart testified that Topper initially told her he was down near the river and did not see who shot Hotchkin; but after the plea deal, Topper said he witnessed the shooting and Allison killed Hotchkin. She also testified that another inmate in the jail advised Topper and Thomas to sync their stories to get the most advantageous plea deals for testifying against Allison. Again, this doesn't appreciably advance Allison's claim of actual innocence. It merely confirms that Topper offered varying accounts of his involvement in the incident, calling his credibility into question. And that is nothing new.

At the outset, Topper told law enforcement he wasn't involved in any burglaries with Allison and Thomas and disclaimed knowing what was about to happen at Walnut River. So the jury heard how Topper's account evolved, particularly as the plea deal took shape. Had Hart testified at trial as she did at the 60-1507 hearing, that simply would have added to the perception that Topper gave inconsistent accounts of Hotchkin's murder. And there is no particular reason to assume that what Topper told Hart was the truth rather than an artificial version he arrived at early on to minimize his criminal liability. In short, Hart's hearing testimony did not point to Allison's actual innocence.

The district court correctly found that Allison failed to show actual innocence as an exception under K.S.A. 60-1507(f) excusing the late filing of his motion.

Allison testified at the 60-1507 hearing to offer an explanation of his notable delay in filing the motion. He told the district court he had been housed in administrative segregation for his first several years in prison and described that as essentially solitary confinement. He testified he has had other much shorter periods of confinement in administrative segregation. He further testified that he had limited access to legal materials while he was so confined. But that alone does not explain Allison's failure to file before the 2004 deadline, since he had been placed in the general prison population about seven years earlier.

But Allison also testified that his extended confinement in administrative segregation at the start of his imprisonment left him with mental impairments that inhibited him from going to places where numerous people congregated, such as the prison law library. Nonetheless, Allison managed to file a motion to correct an illegal sentence.

Allison also outlined his difficulties in obtaining a transcript of his trial. The record shows he did not secure a trial transcript until November 2017. Before then, he wrote letters to various people to try to track down a transcript. Allison said nobody told him he could pay for a transcript and get it that way. That's ignorance of the law and isn't considered a sufficient ground for manifest injustice. Panels of this court have repeatedly so held. See *Thomas v. State*, No. 127,562, 2025 WL 502483, at *1 (Kan. App. 2025) (unpublished opinion) ("[I]gnorance of the law does not constitute manifest injustice that would excuse an untimely 60-1507 motion."); *McKinnis v. State*, No. 125,982, 2024 WL 1694895, at *4 (Kan. App. 2024) (unpublished opinion); *Jones v. State*, No. 122,245, 2021 WL 936020, at *1 (Kan. App. 2021) (unpublished opinion); *Dotson v. State*, No. 122,694, 2020 WL 6935593, at *3 (Kan. App. 2020) (unpublished opinion); *Harris v.*

*State*, No. 120,942, 2020 WL 1482424, at *3 (Kan. App. 2020) (unpublished opinion). As the State points out, Allison waited about three years after getting the transcript to file his 60-1507, which is at least inconsistent with the purpose of the one-year deadline in advancing the prompt adjudication of collateral challenges while witnesses remain available and their recollections largely undimmed by the passage of time.

Moreover, the district court made a generic finding in its order that Allison was "not credible as to his excuses" for not timely filing the 60-1507 motion. That undercuts his claims about his purported impairments resulting from his initial administrative segregation. We cannot look behind that credibility determination.

The district court correctly found that Allison had not advanced compelling reasons justifying the 16-year delay in filing his 60-1507 motion.

The district court's findings on manifest injustice foreclose any further review of Allison's 60-1507 motion. We, therefore, do not consider and express no opinion on the claims he has made in the motion. Likewise, we do not consider the State's intriguing, if debatable, alternative argument that the equitable rule of laches—a doctrine that precludes a party from resting on their rights to the unfair prejudice of a party eventually called to answer in court for a perceived wrong—ought to bar any relief for Allison because of his inordinate delay in filing the motion. We do not engage debatable, though legally extraneous, contentions simply because they are intriguing.

Affirmed.